Ann **FAUSTO**, Helen Howe, Trisha Lane, Maryanne Cuillo, American Civil Liberties Union-Rhode Island Affiliate, Plaintiffs,

v.

James W. **DIAMOND**, Department of Parks, Superintendent, City of Providence, Arthur Bergel, Carmine A. Bucci, Carol S. Dutcher, Thomas Boyle, Vincent J. Cirelli, Members of the Board of Park Commissioners of the City of Providence, Vincent Cianci, Mayor of the City of Providence, and Stephen Napolitano, Treasurer of the City of Providence, Defendants.

Civ. A. No. 80–0520 S.

United States District Court,
D. Rhode Island.

June 19, 1984.

---

The case was tried to the court, sitting without a jury, in June of 1983. In addition to live testimony, the parties submitted an agreed statement of facts, several depositions, defendants' answers to plaintiffs' interrogatories and numerous exhibits. The court, in the presence of counsel, also viewed the locus which is at issue.

After receipt of trial briefs, and with the knowledge that a significant Establishment Clause case had been taken under advisement by the Supreme Court, this court determined that resolution of the controversy sub judice should be deferred pending such appellate guidance as might be forthcoming. That decision, *Lynch v. Donnelly,* —— U.S. ——, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), has now been rendered. Counsel have recently submitted supplemental briefs, illuminating this case in the afterglow of *Lynch.* And, that accomplished, this opinion contains the court's findings of fact and conclusions of law as required by Fed.R.Civ.P. 52(a).

Revens & DeLuca, Sandra A. Blanding, Amato A. DeLuca, Warwick, R.I., for plaintiffs.

Charles Pisaturo, City Sol., Gerard McG. DeCelles, Sp. Asst. City Sol., Herbert F. DeSimone, Jr., Asst. City Sol., Providence, R.I., for defendants.

## OPINION AND ORDER

SELYA, District Judge.

This case poses a vexing question: does the continuous display, maintenance and preservation of a memorial dedicated to the "Unknown Child" and located on property owned by the City of Providence, violate the Establishment Clause of the First Amendment to the United States Constitution? There can be no question but that the Fourteenth Amendment made the Establishment Clause protections applicable to the states. *E.g., Everson v. Board of Education,* 330 U.S. 1, 5, 67 S.Ct. 504, 506, 91 L.Ed. 711 (1947).

## I.

The Cathedral of Saints Peter and Paul (Cathedral), the largest church in the Roman Catholic Diocese of Rhode Island (the population of which is over 60% Roman Catholic, *Donnelly v. Lynch,* 525 F.Supp. 1150, 1163 n. 21 (D.R.I.1981), *aff'd,* 691 F.2d 1029 (1st Cir.1982), *reversed on other grounds,* —— U.S. ——, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)), is located in the downtown area of Providence, Rhode Island. Its front steps open onto property owned by the City of Providence and known as Cathedral Square. Diocese offices also border Cathedral Square, as do an attractive complex of housing for the elderly and several secular commercial establishments. Hanging over the front of the diocesan offices is a large latin cross, not on municipal property. The Square was constructed on the site of abandoned public streets as part of an urban renewal project completed in 1975. Twenty-five percent of the funds used for the Cathedral Square project came from the City of Providence and the remainder from a federal grant. A large,

cylindrically shaped waterfall fountain graces the scene. Its construction was integral to the renewal project's efforts to develop Cathedral Square as an urban mini-park area for the use and enjoyment of the citizens of Providence.

By 1979, the fountain had fallen into disrepair, due in part to the City's fiscal crisis. That spring, a group which came to be known as the Committee for the Memorial to the Unknown Child (Committee) met with defendant James W. Diamond, the Superintendent of the Department of Parks and Secretary to the Board of Park Commissioners for the City of Providence (Board). The evidence is unclear as to whether the idea for the restoration, described *post*, originated with the Committee or with Diamond; in any event, the point is not essential to this decision. There was some loose overlap between the Committee and an anti-abortion organization known as Catholics for Life (CFL).[1] Additionally, some members of the Committee were affiliated in other ways with the right-to-life movement.

Diamond and the Committee discussed the fact that the United Nations had declared 1979 to be "The Year of the Child." The Committee wanted "to do something to commemorate and honor the unknown child" whom Marshall Gillette, co-chair of the Committee, defined as young people affected by "divorce and broken homes ... kids that come to school with bruises, you know that they didn't fall down the steps and just—this is the thing we were thinking about mostly, children who really aren't thought about, they're just left to be on their own. Those are children who really are unknown. There's lots of them." Deposition of M. Gillette, June 8, 1983, at 8. McOsker, asked essentially the same question, described the unknown children as "the children today with child abuse ... and the children that are deprived of food and the children that are left neglected and ... the living child today is the unknown child that is not being cared for properly...." Deposition of J. McOsker, April 25, 1983, at 6. "Living child[ren]," in McOsker's view, also included "fetuses in the womb." *Id.* at 7. *But see* Gillette Deposition at 8–9. The inspiration for the name of the memorial came from the world-famous "Tomb of the Unknown Soldier" in Arlington, Virginia. Gillette Deposition at 8. The Committee spokespersons told Diamond that they were opposed to child abuse and that they regarded a fetus as a child. Deposition of J. Diamond, Mar. 16, 1983, at 19. According to Diamond, Committee members wistfully expressed the thought that it would be "beautiful" to have the fountain operable again. *Id.* The Committee proposed to repair the fountain at no cost to the City if it could be established as a Year of the Child memorial to the "unknown child," and denominated as "The Fountain of Life." *Id.*

Diamond, a public servant accustomed to the peculiar budgetary constraints endemic to older northeastern cities, thought that it would be serendipitous to get the fountain fixed at no expense to the City, and was happy to volunteer Park Department employees to help, Diamond Deposition at 27, but he was concerned about what he foresaw as possible constitutional problems with the concept. He discussed the proposal with the then director of the Rhode Island affiliate of the American Civil Liberties Union (RIACLU), John Gaffney. Eventually, Diamond, the Committee, and the RIACLU worked out a mutually-acceptable compromise; and on May 15, 1979, the

---

1. The plaintiffs, relentlessly emphasizing this perceived link, point to the fact that the president of the CFL, Joanne McOsker, assisted the Committee in raising funds and organizing support for the Memorial. Yet, there was no formal interchange between the Committee and the CFL; and many of the Committee's leaders had no relationship to the CFL. McOsker herself, while personally committed to and deeply involved in the project, was neither an officer nor a member of the Committee. McOsker denied that the Committee sprang from the bosom of the CFL, and there is no evidence to the contrary. The attempt to treat the two groups as the flip sides of a single coin smacks of a foray in guilt by association, and is not supported by the record. The Committee was not a sectarian entity as such.

Committee presented the consensus plan to the Board.

According to the Minutes of the Board of Park Commissioners Meeting dated May 15, 1979 (May 15 Minutes), Diamond briefed the Board on the condition of the fountain, the Committee's restoration proposal, and the estimated repair costs. He reported that the Committee wanted to donate the necessary repairs and to install a plaque "to note the donation in honor of the International Year of the Child and the victims of child abuse at every age." *Id.* at 1. Diamond told the Board that, in his mind, there were constitutional questions involving the plaque's wording: he thought, quite understandably, that it should be devoid of political or religious propaganda. Because the City had no money which could be used to rehabilitate the font, Diamond told the Board, it would be in the taxpayers' interest to accept the donation if a constitutionally appropriate way could be found to do so. *Id.*

Following Diamond's presentation, Professor James Kelly of Providence College, a Dominican institution, spoke on behalf of the Committee. He presented three quotations for the Board's consideration, viz.:

> I have set before you life and death, the blessing and the curse. Choose life, then, that you and your descendants may live. 30 Deuteronomy.
>
> If a man lose reverence for any part of life, he will lose reverence for all life. Dr. Albert Schweitzer.
>
> A baby is God's opinion that life should go on. Carl Sandberg.

The Board was told, in substance, that the Committee, as part of the overall gift, proposed to have a suitable plaque made, engraved with one of this trio of quotations, and installed at the Square. The Board had the option to choose among the suggested inscriptions.

The Board discussed the Committee's proposal. That debate was on a high plane and was entirely unoffensive. There was no hint of the rancor to come. Then, on a motion by Commissioner Boyle, seconded by Commissioner Cirelli, the Board unanimously accepted the donation, subject to the following conditions:

> [T]he design aspects of the installation of the plaque and the work done on the fountain had to be to the technical satisfaction of the Superintendent of Parks or of the staff members he designated for this purpose and second, that while any of the three texts specified by Professor Kelly were acceptable to the Commission, any alteration in those texts or any other texts would have to be specifically approved by the Board prior to the installation of any plaque.

May 15 Minutes at 2.

Funds for the repair were solicited, inter alia, through mailings to various segments of the community and through stories in the Providence Visitor, a newspaper published by the Diocese. *See, e.g.,* Providence Visitor, May 24, 1979, at 3. One of the letters used in soliciting funds for the Memorial was introduced into evidence. The letter, dated November 27, 1979, is printed on Committee stationary and states, in part:

> The Committee for the Memorial to the Unknown Child was formed in this Year of the Child to focus the attention of people from all over Rhode Island and the United States on the abused, the neglected, the disabled, the starving, the retarded, and most horrendous of all, the aborted child....
>
>     *      *      *      *      *      *
>
> Our project has been to turn on the waters in the cylindrically shaped fountain, owned by the City of Providence, located on Cathedral Square, and to rededicate the fountain, calling it the "Fountain of Life."
>
> "The Fountain of Life" emphasizes hope for a continual renewal of the spirit of a respect for life and especially for the lives of the children.

By the beginning of June, 1979, the Committee had repaired the fountain and had selected the passage from Deuteronomy as the message of choice. No municipal funds were used, nor did either the Roman Catho-

lic Church or the CFL contribute to the cost of the work. The Committee organized a ceremony at which the fountain would be dedicated as the Fountain of Life. According to a report in the Providence Visitor, June 7, 1979, at 3, col. 1, the function was attended by approximately two hundred people. Professor Kelly served as master of ceremonies and introduced three clergymen who blessed the fountain: Rabbi Jerome Gurland of Temple Sinai, Reverend Christopher Phillips of St. Barnabas Episcopal Church, and Father Richard Donnelly of St. Paul's Church. The Committee purposefully sought a broad spectrum of clerical participation "to convey to the public that it [the Memorial] was universal, not any specific religion, not any specific organization ... that this memorial was to belong to everybody.... It wasn't to designate any specific group." McOsker Deposition at 37. Rabbi Gurland "spoke of the meaning of life," Providence Visitor, June 7, 1979, at 3, col. 4, and quoted the verse from Deuteronomy. Reverend Phillips read from Psalm 8. *Id.* Father Donnelly "urged that the fountain be a 'reminder of the respect due all human life, especially the unborn children in the mother's womb.'" *Id.*

As a part of the festivities, Mrs. Margherite Garrahy, wife of Governor J. Joseph Garrahy of Rhode Island, gave the signal for the water in the fountain to be turned on. In her preliminary remarks, she "likened the fountain to a symbol of God's overflowing love to all humanity and asked for prayers for a greater awareness and deeper understanding of Him. 'It is only through God's grace' that the evils and ills of society can be eradicated, she said." *Id.* Professor Kelly, in his speech, "expressed the hope that seeing the flowing waters would remind people of the injustices, abuses and evils to children."

Once the Fountain of Life was dedicated, the Committee arranged for two plaques to be engraved. In doing so, the Committee

went beyond its earlier representations to the Board and Diamond. The first plaque contained the words

FOUNTAIN OF LIFE

A MEMORIAL TO

THE UNKNOWN CHILD

to the left of which was an etching of a mother and child. The same etching was inscribed on the second plaque to the left of the designated verse from Deuteronomy. The two etchings of the mother and child present simple figures with soft features: the viewer sees the profile of the mother, her long hair drawn away from her face by a simple ribbon, gazing down at a curly-haired child which she holds. The sketches were the handiwork of an unidentified engraver; they had been commissioned "to enhance the beauty of the stone." McOsker Deposition at 31. The artist had been requested to portray a woman with the child to depict the mother as the "life force" and to symbolize the concept of "universal motherhood." *Id.* at 34.

Diamond learned of the plaques' design prior to the time they were to be permanently installed in front of the fountain. Because the etchings of the mother and child and the words "A MEMORIAL TO THE UNKNOWN CHILD" has not been pre-approved by the Board, he arranged for the plaques to be placed in temporary mountings pending action by the Board.[2] In the interim, the RIACLU filed a formal request with the Board urging that the plaques be removed or modified to conform precisely with the Board's May 15 resolution. This complaint was placed on the Board's agenda for its November, 1979 meeting.

Meanwhile, the Committee sponsored a second dedication ceremony in Cathedral Square, which was held on Sunday, October 7, 1979. The RIACLU tape-recorded the proceedings, and that tape was played at the trial. The program opened and

---

**2.** The fountain, as repaired, and the inscribed plaques, as installed, are hereinafter sometimes collectively referred to as the "Memorial".

closed with responsive prayers led by Reverend Phillips and Father Donnelly; though the evidence suggests that a rabbi was invited but was unable to attend, it is far from conclusive on this point. The prayers referred, inter alia, to the "unborn child" and "life from the moment of conception." Diamond spoke, praising the work of the Committee and referring to the dedication as "our ceremony."[3] A representative of the Knights of Columbus (a Catholic service organization) presented a donation from his group, which was accepted by McOsker on behalf of the Committee. Finally, Governor Garrahy addressed the assemblage at some length about his recent meeting with Pope John Paul II, discussing with undisguised approbation the Pope's wishes anent the United States and his emphasis on respect for life, both born and unborn. There is every reason to believe that this choice of topic sprang spontaneously from the gubernatorial brow, and was in no way prompted by the City or by the Committee.

Both of the dedication ceremonies were sponsored by the Committee, which took the initiative in all respects. The City did not expend any funds in connection therewith. It was not consulted as to the content of the proceedings on either occasion.

The RIACLU complaint was discussed by the Board at its November 6, 1979 meeting. The session was well attended both by members and supporters of the Committee and by those opposed to the Memorial. The RIACLU reiterated that the organization was not opposed to the proposals for the plaques originally submitted to the Board in May, but contended that the additions turned the plaques into a promotion for a " 'a particular, controversial and sectarian point of view regarding abortion and the right to choose abortion' which 'repre-

sent an unconstitutional establishment of religion.' " Minutes of the Board of Park Commissioners Meeting, dated November 6, 1979 (November 6 Minutes), at 2. The November 6 Minutes report that the RIACLU and "assorted feminist organizations ... were bitterly opposed to the additions and indicated their intention to sue this Board ... if these additions were approved." *Id.* at 1.

Board Chairman Carmine A. Bucci initiated the discussion by stating that the etchings of the woman and child "were added without permission of the Board ... and that this was 'very, very improper.' " *Id.* He stated that he would not vote because his daughter was a nun, but that he felt free to participate in the discussion. *Id.* Bucci reported that he had been visited by individuals favoring the Committee's work and read a telegram endorsing the plaques. *Id.* Joseph B. Going, attorney for the Committee, then spoke. Going argued that the purpose behind the Committee's project "proved that it is false that the plaque promotes a particular religious position and depicts the Blessed Virgin Mary and the infant Jesus as alleged by the RIACLU." *Id.* Going referred to the United Nations declaration denominating the Year of the Child and stated that there should be memorials to unknown children just as there are memorials to unknown soldiers. He credited a book (presumably secular in nature) authored by Frederick Worthing, M.D., as having sparked the idea for the Memorial. He denied that the etchings were sectarian and contended in a rather simplistic manner that, since the Committee was called "the Committee for the Memorial to the Unknown Child the phrase the Memorial to the Unknown Child could be considered approved by implication."

---

**3.** The printed program for the ceremony was introduced into evidence. The front page of the program contained a picture of the fountain, the second page displayed the Deuteronomy verse, the third page set forth the schedule of events (Providence Mayor Vincent A. Cianci was listed as a speaker, but apparently failed to appear), and the back page launched an appeal for funds for the Committee and the following verbiage

(attributed to Mother Teresa): "God always provides. He provides for the flowers and the birds, for everything He has created. And those little children are His life.... Our way is to preserve life, the life of Christ in the life of the child." The program was not pre-approved by the City, nor was it printed at municipal expense.

*Id.* at 2. It should be noted, parenthetically, that the Board had long been aware of the Committee's self-designated appellation. *See, e.g.,* May 15 Minutes at 1.

Gaffney then read a statement summarizing the RIACLU's position. He contended that " 'the message of the plaques is meant to be anti-abortion, anti-choice,' " and referred to the articles regarding the Memorial in the Catholic press and to the "anti-abortion, anti-choice ... tone" of the dedication ceremony. November 6 Minutes at 2. Gaffney pointed out that " 'what might be neutral in content at Kennedy Plaza [a public square between the Providence City Hall and the United States Court House, also in downtown Providence] is not [neutral] when seen in Cathedral Square.' " *Id.* The placement of the etchings in Cathedral Square, Gaffney explained, made it more likely that passing observers would believe the etchings to be "the Infant Jesus and the Blessed Virgin." *Id.* at 3. He concluded by charging that " 'the actions of the ... Committee, attempting to present this Commission with a fait accompli is [sic], we believe, a deliberate effort by the Memorial Committee to evade the law and is patently dishonest.' " *Id.* at 2.

During the ensuing colloquium, several members of the public spoke for and against the plaques as temporarily installed. One individual "accused the ACLU of attempting to intimidate the Board ... and argued that telephone poles with cross bars would be unconstitutional by inference as a reference to the cross on public property." *Id.* at 3. Another "accused the ACLU and Planned Parenthood of 'anti-Catholic bigotry' for not objecting to the Deuteronomy quotation but objecting to the image." *Id.* Among those speaking against the installation of the plaques as designed was Maryanne Cuillo, one of the plaintiffs herein. Cuillo, who for several years had been (and remains) the executive director of the Planned Parenthood affiliate in Rhode Island, made it clear that she was speaking as a private citizen. *Id.* She commended the Committee for its donation and for the choice of the Deuteronomy text. *Id.* She

argued however, that the "plaques as modified were not neutral" and that the phrase " 'unknown child' " must be eliminated as likely to confuse." *Id.*

Eventually the debate wound down. According to the November 6 Minutes, Commissioner Boyle stated "that he was a Roman Catholic and very proud of it and moved to approve the plaques as installed including all changes." *Id.* at 4. Commissioner Cirelli seconded the motion, stating that the Commission would have to go to court as a result of its approval of the plaques. *Id.* A roll call vote was then called. Commissioners Bergel and Dutcher, the two non-Catholics on the Board, voted against the installation and Commissioners Cirelli and Boyle voted in favor. *Id.* After asking the Board's lawyer if he could vote, Chairman Bucci cast the deciding ballot in favor of allowing permanent affixation of the plaques. *Id.* The Committee acted upon that vote, and this litigation ensued. The defendants, all municipal office-holders, were each sued in his/her official capacity. The particular office held at the time by each is indicated accurately in the case caption.

At trial, the parties agreed that the Committee spent a total of approximately $5000. to repair the fountain and install the two plaques. The City and the Board did not spend any municipal funds for the installation, erection or purchase of the plaques, but municipal funds have been used to maintain Cathedral Square (including the Memorial) and to pay for running the fountain. Indeed, the City's responsibility for maintenance and operation of the fountain and the Square antedated the establishment of the Memorial by several years. And, these disbursements are continuing. There is no suggestion that the dollar amounts involved have been, or will be, substantial.

Dr. Ann Fausto, a Providence resident and lifelong atheist, testified at trial that she had seen the Memorial and believed it to be a religious statement on abortion. As a taxpayer, she objected to this use of

municipal funds. She emphasized the importance of viewing the fountain and plaques in the context of Cathedral Square (the dominant point of which is the Cathedral from which the Square takes its name). Because the Memorial's backdrop is the Cathedral, the engravings of the mother and child, together with the quotation from Deuteronomy, in her view gained a religious significance which would be absent if seen in a more nondescript setting. Fausto testified that she believed the etchings to be renditions of the Madonna and Child, figures with great religious significance to Christians (and especially, Roman Catholics).

Cuillo, who was a Providence resident and taxpayer at the time the Memorial was constructed and at the time this lawsuit was filed—but not at the time of trial—also testified. She, too, emphasized the importance of viewing the quote from the Bible and the etching of the mother and child in front of "the largest and most significant" Catholic church in the diocese. She believed that the Memorial was religious in nature, and that the etchings represented the Madonna and Child. Whilst disclaiming any nopopery, this plaintiff, as a Catholic, objected to her church linking its position on abortion with the City of Providence by the use of public property.

Gaffney likewise testified on behalf of the plaintiffs. His testimony covered much the same ground as his statements to the Board at its November 6, 1979 meeting. The carvings appeared to him, too, as the Madonna and Child; taken together with the phrase from Deuteronomy, he averred that they added an unmistakably religious signification to the Memorial.

Finally, plaintiff Helen Busby (nee Howe), another Providence resident and taxpayer, appeared as a witness. She stated that she had always assumed that the fountain was church property, and had decided to join the lawsuit when she learned that the City owned it. She professed her belief that excerpts from the bible did not belong on public terrain. The etchings, she thought, looked like the Madonna and Child: there was no father present.[4] Busby also testified that she was a member of an organization called "Women Against Violence Against Women" (WAVAW), and that this group often started rallies and marches in Cathedral Square in defiance of the anti-abortion sentiments which they believed the Memorial to proclaim.

In their complaint, plaintiffs allege that the Memorial constitutes a religious symbol whose principal and primary effect is to advance a particular creed and which has caused and continues to cause excessive government entanglement with sectarian views. Plaintiffs contend that the City's active support for the creation and maintenance of the Memorial violates the Establishment Clause of the First Amendment, as incorporated into the Fourteenth Amendment. According to plaintiffs, defendants' backing for this theistic symbol also constitutes interference with the rights of plaintiffs to the free exercise of their religious credos, guaranteed by the Constitution. To ameliorate these perceived abridgements, they pray for declaratory relief and mandatory injunctions against (i) the continued display of the two plaques as they currently exist, (ii) the allocation and disbursement of funds by the City for the support, maintenance and protection of the Memorial, and (iii) continuing (or future) municipal sponsorship of the Memorial.

II.

Defendants first challenge the plaintiffs' standing to bring this action. While this inquiry must be addressed, it need not long detain the court. The parties have stipulated to the fact that the named plaintiffs Fausto, Busby, Lane, and Ciullo were, at the time of the actions complained of and at the time this suit was filed, residents of

---

4. The proponents of the Memorial have proffered a plausible elucidation of the use of the mother figure, *e.g.,* McOsker Deposition at 34, and the court accepts this explanation as credible. It can be noted, parenthetically, that the Roman Catholic religion does not share with certain other faiths, say Judaism, a strictly matroclinous view of religious heritage.

the City and municipal taxpayers, and residents of Rhode Island and of the United States. The parties have further stipulated that the RIACLU is a non-profit corporation organized under and by virtue of the laws of Rhode Island; that its dues-paying membership numbers approximately one thousand individuals, an unspecified majority of whom are residents of Providence; and that one of the group's avowed purposes is "to maintain, defend and advance civil liberties and civil rights, including the freedoms of ... religion."

In order to invoke the jurisdiction of the federal courts, Article III of the Constitution requires the plaintiffs to demonstrate that (i) they have personally suffered, or are in immediate danger of suffering, some actual or threatened injury as a result of the conduct of the defendants; (ii) such injury fairly can be traced to the challenged action; and (iii) the injury is likely to be palliated by a favorable decision. *See City of Los Angeles v. Lyons,* 461 U.S. 95, ——, 103 S.Ct. 1660, 1665, 75 L.Ed.2d 675 (1983); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (*Valley Forge*); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968); *Munoz-Mendoza v. Pierce,* 711 F.2d 421, 424–25 (1st Cir.1983). The individual plaintiffs in this case allege that they have been injured through defendants' continued expenditure of plaintiffs' municipal tax dollars on the maintenance of a religious symbol, in violation of the Establishment Clause. Because plaintiffs' putative injuries can be directly traced to the challenged action and because the court has the power to redress the claimed harm, the individual plaintiffs clearly meet the second and third prongs of the standing test. The sole question of any moment is whether these plaintiffs meet the first requirement (actual or threatened harm).

In *Flast v. Cohen,* the Supreme Court held that, despite the general rule of *Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923) (barring federal taxpayer standing to challenge the constitutionality of a federal statute), a federal taxpayer will have alleged a sufficient economic injury to confer standing if he or she alleges that congressional action under the Taxing and Spending Clause, Art. I, § 8, is in derogation of those constitutional provisions which operate to restrict that legislative power. 392 U.S. at 106, 88 S.Ct. at 1955. A premier limitation on Art. I, § 8 power is the Establishment Clause of the First Amendment, which was designed as a specific bulwark against governmental use of taxing and spending powers to exalt one religion over another or to aid religion in general. *Id.* at 104, 88 S.Ct. at 1954; S. Cobb, *Rise of Religious Liberty in America* 490–99 (1902); 2 *Writings of James Madison* 183, 186 (Hunt ed. 1901).

*Valley Forge* appears to have limited the *Flast* exception to challenges of the use of congressional power undertaken pursuant to the Taxing and Spending Clause. *Valley Forge,* 454 U.S. at 479–80, 102 S.Ct. at 762. Yet, as the First Circuit recently noted in *Donnelly v. Lynch, supra,* 691 F.2d at 1031, the Court gave no indication in *Valley Forge* that it intended to overrule the long line of cases establishing that, in contrast to federal taxpayers, municipal taxpayers have standing to challenge the allegedly unconstitutional use by a municipality of their tax dollars. *Id.* at 1031. The distinction, the First Circuit found, was made clear in *Frothingham v. Mellon,* 262 U.S. at 486–87, 43 S.Ct. at 600–01: "The interest of a taxpayer of a municipality in the application of its moneys is direct and immediate and the remedy by injunction to prevent their misuse is not inappropriate." Accordingly, in *Donnelly v. Lynch,* the First Circuit affirmed the district court's finding that several residents and taxpayers of the City of Pawtucket had standing to contest, on Establishment Clause grounds, the city's ownership and display of a life-sized Christian nativity scene as part of a city-sponsored outdoor Christmas

exhibit on public property.[5] The "injury" asserted by the individual plaintiffs in this case cannot be distinguished on standing grounds from that suffered by the *Lynch* plaintiffs. This court therefore follows the First Circuit's lead in holding that at least some of the present plaintiffs (*e.g.*, Fausto, Busby, Lane) have standing as municipal taxpayers to challenge the City's maintenance of the Memorial. Because these individual plaintiffs have thereby validly laid claim to an economic injury, even though it may be minimal, see *Stone v. Graham*, 449 U.S. 39, 42 n. 4, 101 S.Ct. 192, 194 n. 4, 66 L.Ed.2d 199 (1980) (per curiam),[6] and because these plaintiffs have standing, the court need not consider whether they have also sustained non-economic injuries sufficient independently to confer standing, or whether Cuillo's move from Providence has deprived her of standing, or whether the RIACLU has standing to represent the interests of its members. *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264 n. 9, 97 S.Ct. 555, 562 n. 9, 50 L.Ed.2d 450 (1977); *Rabun County*, 698 F.2d at 1108–09; *Lynch*, 691 F.2d at 1032.

### III.

The nature of the Memorial as a religious symbol *vel non* does not appear in easily-identifiable blacks and whites on this chiaroscuro record. It is plain that the court should not essay to scrutinize the components of the Memorial piecemeal; to the contrary, the plaques, the fountain, their placement, and the entire mise-en-scene, must be viewed as a unit. The plaques and fountain were obviously designed to fit architecturally and aesthetically with Cathedral Square. And, when observing the fountain and the Square, it is impossible to ignore the imposing backdrops of the Cathedral and of the diocesan offices. The teachings of the Court consistently admonish that symbols should be evaluated in context, rather than in an intellectually-sanitized ivory tower. *E.g., Lynch*, —— U.S. at ——, 104 S.Ct. at 1362; *Stone v. Graham*, 449 U.S. at 42, 101 S.Ct. at 194. *Lemon v. Kurtzman*, 403 U.S. 602, 615, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971), is illustrative. There the Court took into account, among other things, the proximity of schools to parish churches and the religious symbols and statuary adorning the school buildings in concluding that aid to parochial educational institutions involved substantial religious activity and purpose, thereby recognizing that context played a role in determining religiosity.

Nor is this court's task in deciphering the nature of the Memorial made easier by the insistent spotlight which all parties to the litigation have focused upon the status of the display vis-a-vis the issue of abortion. It is undeniably true, as the plaintiffs exhort, that the Roman Catholic Church is militant in its opposition to abortion, and that the Church regards the obligation to preserve human life as religiously-based

---

5. The Court's grant of certiorari in *Lynch*, 460 U.S. 1080, 103 S.Ct. 1766, 76 L.Ed.2d 340 (1983), did not extend to the standing issue; and the Court, in deciding *Lynch* on the merits, appears to have assumed arguendo that the plaintiffs had standing to sue.

6. As the dissent noted in *Valley Forge*, the sufficiency of the injury suffered by a taxpayer is not dependent on the extent of his tax payment, 454 U.S. at 497, 102 S.Ct. at 771 (Brennan, J., dissenting), or, by implication, on the size of the taxing entity's challenged expenditure. *See United States v. SCRAP*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973), wherein the Court stated:

"Injury in fact" ... serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake ... than a fraction of a vote, see *Baker v. Carr*, 369 U.S. 186, [82 S.Ct. 691, 7 L.Ed.2d 663]; a $5 fine and costs, see *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393; and a $1.50 port tax, *Harper v. Virginia Bd. of Elections*, 383 U.S. 663, [86 S.Ct. 1079, 16 L.Ed.2d 169]. *Accord A.C.L.U. v. Rabun County Chambers of Commerce, Inc.*, 698 F.2d 1098, 1108 (11th Cir. 1983) (*Rabun County*).

and theologically imposed.[7] But, it does not follow that governmental action transgresses the Establishment Clause merely because the tenor of such action "happens to coincide or harmonize with the tenets of some or all religions." *McGowan v. Maryland*, 366 U.S. 420, 442, 81 S.Ct. 1101, 1113, 6 L.Ed.2d 393 (1961). *See also Bob Jones University v. United States*, 461 U.S. 574, —— n. 30, 103 S.Ct. 2017, 2035 n. 30, 76 L.Ed.2d 157 (1983); *Harris v. McRae*, 448 U.S. at 319–20, 100 S.Ct. at 2689; *Women's Services, P.C. v. Thone*, 636 F.2d 206, 209 (8th Cir.1980) (per curiam); *Crowley v. Smithsonian Institution*, 636 F.2d 738, 742–43 (D.C.Cir.1980). And less than four years ago, the Court, faced with a conceptually identic argument, upheld the so-called Hyde Amendment, Pub.L. 96–123, § 109, 93 Stat. 926; *see also* Pub.L. 96–86, § 118, 93 Stat. 662, a legislative enactment unabashedly restricting government funding of abortions, as being "as much a reflection of the 'traditionalist' values towards abortion, as . . . an embodiment of the views of any particular religion." *Harris v. McRae*, 448 U.S. at 319, 100 S.Ct. at 2689. The Court offered the following parallel:

> [T]hat the Judaeo-Christian religions oppose stealing does not mean that a State or the Federal Government may not, consistent with the Establishment Clause, enact laws prohibiting larceny.

*Id.*

Thus, even if one assumes arguendo that the Memorial is, in part, a silent statement regarding abortion which coincides with the teachings of Roman Catholicism, that coincidence "does not, without more, contravene the Establishment Clause." *Id.* at 320, 100 S.Ct. at 2689. The emphasis of the litigants, then, is misplaced: to view the case as a pro-choice, anti-choice litmus is to disregard the rules of constitutional interpretation espoused by the Supreme Court, and to permit the fabric of the First Amendment to be scorched beyond recognition by the firestorm of raging emotions which the continuing social controversy over abortion invariably generates. In the face of well settled precedent, such ustulation throws off plethoric heat, but sheds minimal light.

Putting such considerations aside does not, however, measurably simplify the chore at hand. A determination as to what is or is not religious is at best "a most delicate question." *Wisconsin v. Yoder*, 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972).[8] Indeed, it has been suggested that what constitutes "religion" for some constitutional purposes may not constitute "religion" for all such purposes. *E.g.*, L. Tribe, *American Constitutional Law*, § 14–6, at 827–28 (1978); *see also* n. 23, *post*. And, the case at bar is particularly ill-adapted to definitive answers. The quotation itself typifies the uncertainty.[9] Certainly, that phrase would not convey a particularly theistic meaning if used, say, in a speech at an anti-war rally or brought

---

**7.** The Church's definitive statement on abortion, the Declaration on Abortion of the Sacred Congregation for the Doctrine of Faith of November 18, 1974 (Declaration), *reprinted in McRae v. Califano*, 491 F.Supp. 630, 693 (E.D.N.Y.), *rev'd on other grounds sub nom, Harris v. McRae*, 448 U.S. 297, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980), and the Pastoral Plan for Pro-Life Activities, promulgated by the National Conference of Catholic Bishops under date of November 20, 1975, *reprinted in McRae v. Califano*, 491 F.Supp. at 703–05, embody explicitly religious teachings. Both speak of "the grave sin of abortion," and the Declaration, by its terms, "entails a grave obligation for Christian consciences."

**8.** For what succor it may provide, a typical dictionary defines religion, in part, as:

> A belief in an invisible superhuman power (or powers), conceived of after the analogy of the human spirit, on which (or whom) man regards himself as dependent, and to which (or whom) he thinks himself in some degree responsible, together with the feelings and practices which naturally flow from such a belief.... Any system of faith, doctrine, and worship....

Funk & Wagnalls, New Standard Dictionary of the English Language (1934 ed.).

**9.** The RIACLU originally assented to the use of this inscription, and the defendants, without meaningful citation of caselaw, claim that the plaintiffs are thereby estopped from contesting its lack of religious significance. That asseveration is so far-fetched as to warrant summary rejection.

up in a discussion of medical ethics. *E.g.*, Abram, *Ethics and the New Medicine*, N.Y. Times, June 5, 1983, Magazine at 94, Deposition of Dr. Thomas Ramsbey, July 18, 1983 (Ramsbey Deposition), Exhibit 1. Yet, Deuteronomy is one of the books of the Old Testament, an undeniably sacred text in the Jewish and Christian faiths. *Stone v. Graham*, 449 U.S. at 39, 101 S.Ct. at 192. According to plaintiffs' expert, Deuteronomy collects and comments on the laws "which God ... established for His people, Israel." Ramsbey Deposition at 4. Although Ramsbey opined that the codification of rules in Deuteronomy is "for a people whose understanding of their nation is clearly routed in this relationship to God," *id.* at 8, he conceded that many of the laws collected in Deuteronomy have no direct religious signification. *Id.* at 7.

It can be persuasively argued, on the one hand, that the verse from Deuteronomy here at issue has obvious secular application, as much of the chapter from which the quotation was drawn was used as a basis for the legal codes of western civilizations. *Cf. Stone v. Graham*, 449 U.S. at 41, 101 S.Ct. at 193. And, this court is of such a mind. On the other hand, the quote can be viewed as a commandment from a sectarian god, similar to the Ten Commandments contained in the same book of the Old Testament (especially given the arguably pietistic context in which the plaques are set). And, even on a deserted island, passages from Deuteronomy are not simply "ceremonial and patriotic," without "theological or ritualistic impact." *Aronow v. United States*, 432 F.2d 242, 243 (9th Cir.1970).

The same dual significance can be ascribed, albeit to a lesser extent, to the mother-and-child engravings which adorn each plaque. While innocent enough if viewed in isolation, these depictions, too, must be taken in context. As the Supreme Court stated in *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 632, 63 S.Ct. 1178, 1182, 87 L.Ed. 1628 (1943), "Symbolism is a primitive but effective way of communicating ideas. The use of an emblem or flag to symbolize some system, idea, institution, or personality, is a short cut from mind to mind." One may understand the symbol's message—so that the symbol has performed its job of communicating—without agreeing with it or responding to it; and the symbol is not communicatively sterilized simply because, in and of itself, it may be benign. The court must take judicial notice, Fed.R.Evid. 201, that portrayals of a mother and child have been a popular subject of artists—even those of atheistic bent—for centuries. Many examples of non-theocentric art (too numerous to warrant mention) have been peopled by such figures. Christian art, as one might expect, has mirrored this trend (at least from and after the first Council of Ephesus in 431 A.D., which declared Mary, the mother of Jesus, to be the Mother of God). And, the Madonna, as an art form, has taken on diverse aspects: many renditions portray the Madonna unaccompanied by child (*e.g.*, Botticelli, "The Madonna with the Pomegranate;" Marmion, "Mother Dolorosa"); some reflect larger familial groups (*e.g.*, Mostaert, "The Repast of the Holy Family"); and many renderings of the Madonna and Child show them surrounded by angels or other religious figures (*e.g.*, Serra, "Madonna and Child"; David, "Virgo Inter Virgines"; Schongauer, "The Virgin of the Rose-Bush").

The instant sketches are, as noted above, devoid of any ecclesiastical trappings; and, even given the backdrop of the Cathedral, it is impossible to state with any assurance whether the artist intended simply to depict the portrait of a mother and child or to create a more sectarian vista. In this instance, physicomorphism, like beauty, lies solely in the eye of the beholder. While the court does not question the sincerity of the individual plaintiffs in testifying that they perceived the etchings to be symbolic of the Madonna and Child, the court must question their objectivity. Much of what a person sees in art is shaped by his or her cultural baggage. Different persons, equally sincere, could surely view the depictions in a less hagiographic fashion—as does this court. Once again, the worst that

can be said of the engravings is that they may transmit conflicting signals.

What is troublesome about the Memorial is not what can be seen with the eye or felt with the heart and mind, but certain of the external events which presaged this litigation. The October 7, 1979 dedication ceremony—although arranged by the Committee, rather than the City [10]—was overtly religious in nature: a Roman Catholic priest and an Episcopalian minister led the participants in religious, responsive prayers at the beginning and end of the pageant, and the Governor spoke at length regarding Pope Paul's sermons given during the Pontiff's 1979 visit to the United States [11]. The program for the event contained explicitly doctrinal material. And most significantly, Diamond, apparently in his capacity as a municipal official, participated in this re-dedication.

More worrisome still, at the ensuing Board meeting, two of the commissioners (Bucci, Boyle) declaimed, in effect, that their church required them to vote in support of the installation of the plaques even though the Committee had exceeded the design parameters originally fixed by the Board at its May 15, 1979 meeting. And, the pivotal November 6 vote fell along Catholic/non-Catholic lines. The tone and tenor of the civic debate on that occasion, while perhaps explicable in terms of the human dynamics of the situation,[12] disserved "the objective of preventing unnecessary intrusion of either the church or the state upon the other...." *Lynch*, —— U.S. at ——–——, 104 S.Ct. at 1358–59.

In the absence of such collateral activities, the court would conclude this portion of its analysis by holding flatly that the Memorial does not partake of the essential qualities necessary to constitute it as a religious symbol. But, the Supreme Court has cautioned that along-the-road conduct is relevant to a determination of whether the government's final destination implicates the Establishment Clause. *E.g., Tilton v. Richardson*, 403 U.S. 672, 678–82, 91 S.Ct. 2091, 2095–97, 29 L.Ed.2d 790 (1971); *Lemon*, 403 U.S. at 616, 91 S.Ct. at 2113. *See also Allen v. Morton*, 495 F.2d 65, 72 (D.C.Cir.1973); *cf. Lynch*, —— U.S. at ——, 104 S.Ct. at 1364 ("There is no evidence of

---

**10.** It is difficult to perceive how the City could have thwarted the holding of that event so long as the Committee's plans met the familiar time, place and manner benchmarks. *E.g., United States v. Grace*, 461 U.S. 171, ——, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983); *Cohen v. California*, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284, *reh'g denied*, 404 U.S. 876, 92 S.Ct. 26, 30 L.Ed.2d 124 (1971).

**11.** The Fourth Circuit has observed that "references to the Deity in our ceremonies ... do not violate the Establishment Clause because they merely reflect ... our history [as a nation] and no longer have any potentially entangling theological significance." *Hall v. Bradshaw*, 630 F.2d 1018, 1023 (4th Cir.1980), *cert. denied*, 450 U.S. 965, 101 S.Ct. 1480, 67 L.Ed.2d 613 (1981) (footnote omitted). This principle doubtless has more force in the wake of *Lynch*. But, the revival-meeting crescendo of the October 7 convocation went too far; it surpassed by several decibels the "open-form theological expressions," *id.* at 1023 n. 2, against which the *Hall* court cautioned.

**12.** The court believes, and finds as a matter of fact, that the parturient processes which gave life to the concept of the Memorial were conceived in good faith; that both the City and the

Committee wanted nothing more, at the outset, than to accomplish the twin objectives of rehabilitating the fountain and suitably commemorating the International Year of the Child; and that the project initially proceeded in this vein. The court further finds that the Committee's negligence in overstepping the guidelines approved by the Board was, albeit unfortunate and deserving of criticism, not a purposeful effort to inject religion into forbidden precincts. The situation deteriorated, however, when the RIACLU's complaint was aired; while grounds plainly existed for such a remonstrance, the form which it took was bellicose and overly confrontational, and served merely to polarize the positions of the protagonists. Instead of focusing dispassionately on the underlying (and wholly legitimate) purposes of the undertaking and on the concerns anent the same, everyone seems to have been plunged headlong into an autochthonous defile which brooked no retreat. Ancillary events (the October 7 ceremony and the November 6 Board meeting) were but predictable sequellae of this digression, and wholly tangential to the initial objectives. The parties then and thereafter exhibited a total inability to see the children's rights forest for the pro-choice/pro-life trees; and the ensuing dialogue regrettably became, at least in part, a quasi-referendum on Roman Catholicism.

contact with church authorities concerning the content or design of the exhibit prior to or since [the City's] purchase of the creche."). Placing a can of tomato juice on the State House steps would, in and of itself, be a religiously neutral (if patently ridiculous) act; but none could doubt that it would take on ominous First Amendment overtones if government officials thereafter repeatedly drummed home the message that the enshrinement of the beverage container was meant as a reminder of, say, the doctrine of transsubstantiation or the holy sacrament of the Eucharist. Even in the more relaxed ambience of *Lynch*, the courts must remain vigilant to snuff out "the myriad, subtle ways in which Establishment Clause values can be eroded." *Id.*, — U.S. at —, 104 S.Ct. at 1370 (O'Connor, J., concurring). Although the Memorial itself, objectively viewed, conveys no message of endorsement or disapproval of a particular creed, the effect may be pernicious nonetheless if, by words and deeds, government signals its intention to promote a favored religion, or conversely, to denigrate a disfavored one.

The tenor of the Board's commentary at the critical meeting and the involvement—however innocent or unwitting—of Diamond in the October commemoration (including his reference to the event, in his contemporaneous remarks, as "our ceremony") had the resonance of such a drumbeat. Those actions created the "appearance of a joint exercise of ... authority by Church and State" which in and of itself may provide a significant symbolic benefit to a religious belief in the minds of some individuals. *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 124–25, 103 S.Ct. 505, 511, 74

L.Ed.2d 297 (1982). *Accord Rabun County*, 698 F.2d at 1111.

Whereas the "wall" of separation between church and state, *Everson v. Board of Education*, 330 U.S. at 18, 67 S.Ct. at 512, has lately become more porous than was heretofore the case, *e.g.*, *Lynch*, — U.S. at —, 104 S.Ct. at 1359 ("the metaphor itself is not a wholly accurate description of the practical aspects of the relationship that in fact exists between church and state"), it has not entirely crumbled. Since the City has at least arguably made religion relevant to the Memorial, in public perception if not in actuality, further scrutiny is required.

## IV.

Prior to the decision of the Supreme Court in *Lynch*, the tripartite test (purpose, effect, entanglement) set out in *Lemon v. Kurtzman*, 403 U.S. at 612–13, 91 S.Ct. at 2111, was routinely applied in Establishment Clause cases. *E.g.*, *Mueller v. Allen*, — U.S. —, —, 103 S.Ct. 3062, 3066, 77 L.Ed.2d 721 (1983); *Stone v. Graham*, 449 U.S. at 40, 101 S.Ct. at 193.[13] But *Lynch*, fairly read, represents a retrenchment from that regimen;[14] as Chief Justice Burger took pains to note, while acknowledging that it is often "useful" to undertake a *Lemon* inquiry, *Lynch*, 104 S.Ct. at 1362, federal courts should not "be confined to any single test or criterion in this sensitive area." *Id.* The current of *Lynch* courses strongly; and, while it has not washed *Lemon* away, it has coated the Establishment Clause with a fresh alluvium. In our multi-tiered federal judiciary, it is apodictic that a district court is duty-bound to follow the most current precedents of the highest tribunal in the land;

---

**13.** The Court of Appeals in *Lynch* had suggested, 691 F.2d at 1034, that even the *Lemon* formulation was too mild in this sort of case, indicating a preference for the "strict scrutiny" test of *Larson v. Valente*, 456 U.S. 228, 244–46, 102 S.Ct. 1673, 1683–84, 72 L.Ed.2d 33 (1982). The Supreme Court's decision in *Lynch*, of course, rejected this approach; and, the dissenters there argued not in support of the *Larson* model, but for application of the *Lemon* triptych. *E.g.*, *Lynch*, 104 S.Ct. at 1375 n. 11 (Brennan, J., dissenting); *id.* at 1386–87 (Blackmun, J., dis-

senting). If the creche was not found to be "explicitly discriminatory," *id.* at 1366 n. 13, in the *Larson* sense, then the Memorial a fortiori does not require "strict scrutiny."

**14.** That *Lynch* must be viewed as a landmark, not as an aberration, is evident in light of *Marsh v. Chambers*, — U.S. —, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983), which completely disregarded the *Lemon* model.

and therefore, the merits of the instant controversy must be assessed in the albedo of *Lynch*. Such an approach perforce demands a two-step taxonomy: a particularized appreciation of what *Lynch* entails, and a commonsense application of those principles to the facts sub judice.

### A.

The touchstone of *Lynch* is a frank recognition that total separation of church and state is not possible. *Lynch*, 104 S.Ct. at 1358–59. The *Lynch* Court reaffirmed, *id.* at 1360, the tenet enunciated some three decades ago in *Zorach v. Clauson*, 343 U.S. 306, 313, 72 S.Ct. 679, 683, 96 L.Ed. 954 (1952), that "[w]e are a religious people whose institutions presuppose a Supreme Being." In the words of the Chief Justice:

> No significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from all the other parts, much less from government. "It has never been thought either possible or desirable to enforce a regime of total separation...." *Committee for Public Education & Religious Liberty v. Nyquist*, 413 U.S. 756, 760, 93 S.Ct. 2955, 2958, 37 L.Ed.2d 948 (1973). Nor does the Constitution require complete separation of church and state; it affirmatively mandates accommodation, not merely tolerance, of all religions, and forbids hostility toward any. See, *e.g., Zorach v. Clauson*, 343 U.S. 306, 314, 315, 72 S.Ct., 679, 684, 96 L.Ed. 954 (1952); *McCollum v. Board of Education*, 333 U.S. 203, 211, 68 S.Ct. 461, 465, 92 L.Ed. 649 (1948). Anything less would require the "callous indifference" we have said was never intended by the Establishment Clause. *Zorach, supra*, 343 U.S. at 314, 72 S.Ct., at 684. Indeed, we have observed, such hostility would bring us into "war with our national tradition as embodied in the First Amendment's guaranty of the free exer-

cise of religion." *McCollum, supra*, 333 U.S., at 211–212, 68 S.Ct., at 465.

*Lynch*, 104 S.Ct. at 1359.

The Court specifically abjured a "rigid, absolutist view of the Establishment Clause," *id.* at 1361, remarking that:

> In our modern, complex society, whose traditions and constitutional underpinnings rest on and encourage diversity and pluralism in all areas, an absolutist approach in applying the Establishment Clause is simplistic and has been uniformly rejected by the Court.
>
> Rather than mechanically invalidating all governmental conduct or statutes that confer benefits or give special recognition to religion in general or to one faith—as an absolutist approach would dictate—the Court has scrutinized challenged legislation or official conduct to determine whether, in reality, it establishes a religion or religious faith, or tends to do so. Joseph Story wrote a century and a half ago:
>
>> "The real object of the [First] Amendment was ... to prevent any national ecclesiastical establishment, which should give to an hierarchy the exclusive patronage of the national government."
>
> 3 Story, Commentaries on the Constitution of the United States 728 (1883).
>
> In each case, the inquiry calls for line drawing; no fixed, *per se* rule can be framed. The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application.... The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test.

*Id.* at 1361–62 (citations omitted).[15]

The Court went on to note, *id.* at 1362–65, some rule-of-thumb guidelines for Establishment Clause cases, which may be summarized as follows:

---

**15.** Having announced its preference for an elastic appraisal of the Religion Clauses, the Court paid lip service to *Lemon v. Kurtzman, supra*,

*Lynch*, 104 S.Ct. at 1362; but, in so doing, was quick to disclaim any willingness to be confined to the *Lemon* yardstick. *Id.*

1. The focus of the inquiry must be on the governmental practice or activity, taken in its full context;[16] the courts must beware of concentrating "exclusively on the religious component of any activity." *Id.* at 1362.

2. Absence of a secular purpose is grounds for invalidation only when the governmental practice or activity is "motivated wholly by religious considerations." *Id.*[17]

3. The effect of a challenged practice or activity is no longer to be gauged merely by quantifying the constitutionally positive and negative impacts inherent therein, but by a more objective standard reflecting the degree to which the questioned conduct is "beneficial to and . . . an endorsement of religion." *Id.* at 1363. And, in applying this gradiometer, the Court "plainly contemplate[s] that on occasion some advancement of religion will result from governmental action." *Id.* at 1364.

4. The interplay between religion and the state is also to be weighed on a graduated scale. *Id.* at 1364–65. The primary focus is to be on administrative and institutional entanglement.[18] Nevertheless, there is some intimation by the *Lynch* Court that, if the practice or activity is the by-product of "a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message," *id.* at 1363, it will not withstand constitutional challenge.

5. The fact that government's contribution to an enterprise is minor counts in the balance. *Lynch, id.* at 1364, appears to recognize a *de minimis* factor which the prior caselaw, *e.g., Abington School District v. Schempp,* 374 U.S. 203, 225, 83 S.Ct. 1560, 1573, 10 L.Ed.2d 844 (1963); *Engel v. Vitale,* 370 U.S. 421, 436, 82 S.Ct. 1261, 1269, 8 L.Ed.2d 601 (1962); *DeSpain v. DeKalb County Community School District 428,* 384 F.2d 836, 840 (7th Cir. 1967), decried.

These are, to be sure, rough guideposts at best. And, while *Lynch* may narrow the width of the Establishment Clause gateway, it does not portend that the portal will henceforth be nailed shut. The Court restated its abiding concern for safeguarding "the genuine objectives of the Establishment Clause," *id.* at 1366, and expressly disclaimed any intention to shrink the prophylaxsis of the First Amendment beyond recognition by imposing "a crabbed reading of the Clause on the country." *Id.* While it is fairly debatable whether *Lynch* heralds a difference in kind or in degree, it at the least signifies a shift in emphasis, and offers explicit guidance as to the change in

---

**16.** *See* text *ante* at 460.

**17.** While it is difficult to take this admonition literally, the Court has plainly adjusted the calibration of the conventional secular/religious balance in weighing the purpose(s) underlying government action. It is, for example, now thought to be "irrelevant" whether or not government could achieve the same objective without sectarian intrusion. *Id.* at 1363 n. 7.

**18.** While the Court specifically left open the question of whether potential political divisiveness can serve, under the Establishment Clause, to invalidate otherwise permissible conduct, *id.* at 1364–65, Justice O'Connor has taken a bolder, more direct approach:

In my view, political divisiveness along religious lines should not be an independent test of constitutionality.

Although several of our cases have discussed political divisiveness under the entanglement prong of *Lemon, see, e.g., Committee for Public Education v. Nyquist,* 413 U.S. 756, 796, 93 S.Ct. 2955, 2977, 37 L.Ed.2d 948 (1973); *Lemon v. Kurtzman, supra,* 403 U.S. at 623, 91 S.Ct., at 2116, we have never relied on divisiveness as an independent ground for holding a government practice unconstitutional. Guessing the potential for political divisiveness inherent in a government practice is simply too speculative an enterprise, in part because the existence of the litigation, as this case illustrates, itself may affect the political response to the government practice. Political divisiveness is admittedly an evil addressed by the Establishment Clause. Its existence may be evidence that institutional entanglement is excessive or that a government practice is perceived as an endorsement of religion. But the constitutional inquiry should focus ultimately on the character of the government activity that might cause such divisiveness, not on the divisiveness itself. The entanglement prong of the *Lemon* test is properly limited to institutional entanglement.

*Id.* at 1367 (O'Connor, J., concurring).

course. Still, the reasoning of the *Lynch* Court is wholly consistent with the continued appraisal of such issues on a case-by-case basis by the trial courts ("The [Establishment] Clause erects 'a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship.'" *Lynch*, 104 S.Ct. at 1362, quoting with approval *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112).

### B.

In this case, a two-fold secular purpose is evident: the desire of a financially-strapped municipality to restore public property which had fallen into disrepair, and the wholesome endeavor to center attention on the plight of children in a troubled world. The defendants believed that they could accomplish these laudable goals (and in fact succeeded in doing so) by accepting the largesse of the Committee. Yet with the acceptance of the Committee's donation came a responsibility to administer that gift and insure that the tablets were installed on public property in a manner which complied with the Constitution. State and local governments, after all, are "constitutionally compelled to assure that the state-supported activity is not being used for religious indoctrination" or to advance a religious belief. *Levitt v. Committee for Public Education*, 413 U.S. 472, 480, 93 S.Ct. 2814, 2819, 37 L.Ed.2d 736 (1973); *Allen v. Morton*, 495 F.2d at 72. Initially, the defendants imposed conditions on the restoration of the fountain, and its reconstitution as a Memorial, in order to avoid potential Establishment Clause problems. This effort was entirely commendable. But, upon the occurrence of the events chronicled above, a religious component was, lamentably, added to the mix. The Memorial thus became the repository

of composite purposes: some unexceptionable (indeed, praiseworthy), one alarming.

The existence of such an admixture is, however, neither unprecedented nor surprising. "In a pluralistic society a variety of motives and purposes are implicated." *Lynch*, 104 S.Ct. at 1363. Indeed, the judiciary has, for centuries, outside the First Amendment context, eschewed the speculation necessarily inherent in trying to divine hidden motives of public officials, preferring instead to focus on the objective attributes of an act or practice itself. *E.g., Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 508, 95 S.Ct. 1813, 1824, 44 L.Ed.2d 324 (1975); *United States v. O'Brien*, 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 *reh'g denied*, 393 U.S. 900, 89 S.Ct. 63, 21 L.Ed.2d 188 (1968); *Fletcher v. Peck*, 10 U.S. (6 Cranch) 48, 73, 3 L.Ed. 162 (1810). As with the underlying motivation of the legislators in the string of cases above cited, there is scant profit to be earned from indulging in guesswork as to the "true" motives of the Board majority. And in this case, the Memorial, objectively viewed, passes muster.

*Lynch* teaches that, so long as the secular aims of the governmental activity are "legitimate," 104 S.Ct. at 1363, the purpose prong of what remains of the *Lemon* test is satisfied. Legitimacy, in this court's view, requires that the practice or activity be rationally related to an acceptable secular goal and reasonably adapted to its attainment. Furthermore, the goal itself must be neither insubstantial nor peripheral, and above all, it must be non-pretextual. The City's conduct here fulfils those requirements.[19] That being so, no further inquiry is in order, as *Lynch* has sounded the death knell of any notion that the government's objectives must be wholly secular. *Id.* at 1363 & n. 6. And, whereas *Lynch* does not expressly demand that a

---

**19.** It has long been thought that an overtly religious means cannot be used by government to promote even a genuine secular aim. *E.g., Stone v. Graham*, 449 U.S. at 41, 101 S.Ct. at 193; *Rabun County*, 698 F.2d at 1111; *Hall v. Bradshaw*, 630 F.2d at 1020–21; *DeSpain v. DeKalb County Community School District 428*, 384

F.2d at 839. *Accord Larkin v. Grendel's Den, Inc.*, 459 U.S. at 122, 103 S.Ct. at 510. *Lynch* necessarily casts a shade of doubt upon that proposition. The question need not be resolved here, however, as the Memorial is neither overtly religious nor a theologic symbol per se.

balance be constructed, *see* text *ante* at 466 & n. 17, the court finds, on these facts, that the impropriate ends of the City predominated in this instance over any religiously-inspired purpose.

Nor can the erection of the Memorial fairly be interpreted as "a purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." *Lynch,* 104 S.Ct. at 1363. For the reasons previously cited, the origins of the undertaking cannot be faulted; and it is "irrelevant" that these laudable objectives could have been accomplished by some less intrusive or controversial means. *Id.* at 1363 n. 7. The detour taken by the Committee and the Board in the Fall of 1979, albeit deplorable, was certainly neither "surreptitious" nor "subtle." Most importantly, this advocacy was of a transient nature: it reared its ugly head, spewed its venom, and sank back into the swamp.[20] Its enduring effects, if there are any (and the court knows of none), are insufficient to override the beneficent aims of the project, or to mar its true purposes, or to convert the "Fountain of Life" into a colymbethra. Given the idiocratic facts of this case, to hold otherwise would be to toss the treasure along with the trash.

The primary effect of the Memorial must also be seen through the *Lynch* glass. Prior caselaw is of limited value in this task, in light of the altered perspective which *Lynch,* 104 S.Ct. at 1363–64, commands. Applying the newly-crafted objective standard of *Lynch,* this court is unable to discern that the Memorial is a greater aid to the Roman Catholic faith than was the creche in *Lynch;* and certainly, any benefit to religion which inheres in the Memorial does not rise to the level of importance of those emoluments catalogued and approved by the *Lynch* Court. The net result of the monument, seen as it now sits in the Square, in no way benefits or advances either religion in general or any given creed. And, even if it is assumed arguendo that the exhibit promotes theocracy, then by the *Lynch* yardstick, the degree of enhancement is " 'indirect, remote [and] incidental.' " *Id.* at 1364, quoting *Nyquist,* 413 U.S. at 771, 93 S.Ct. at 2964. Surely, one can argue that *Lynch* is wrongly decided on this point; but, to a court committed by law to follow the teachings of *Lynch,* the plaintiffs' claim that the ultimate effect of the Memorial is an impermissible furtherance of religion is untenable.[21]

The final furculum of *Lemon* creates a dilemma, *Lynch* notwithstanding. Admittedly, there is evidence of entanglement, as witness the November 6 Board meeting and Diamond's participation in the October 7 festivities.[22] Yet, even this commingling was wholly episodic: it was in the nature of a makeshift splice rather than a permanent knot. As *Lynch* admonishes, "[E]ntanglement is a question of kind and degree."

---

**20.** The complaint, after all, asks the court to prohibit the continued display and maintenance of the Memorial by the municipality, and to declare the Fountain of Life repugnant to the Constitution. It does not seek to enjoin the Board from injecting religion into its debates, or to restrain the superintendent from attending theocentric exercises in his official capacity. These phenomena, though meriting rebuke in the context of the events germane to the creation of the Memorial, are relevant to the precise issues before this court only insofar as they are or are not probative of the religiosity of the Memorial itself, or to defined issues in the litigation (*e.g.,* purpose, effect, entanglement).

**21.** It might well be urged that the City ceded control over the Memorial to the Committee; and that the latter, spurred on by doctrinaire fanaticism, created the Memorial in the image of its spiritual philosophy, thereby advancing religion in a manner offensive to the Establishment Clause. *E.g., Gilfillan v. City of Philadelphia,* 637 F.2d 924, 931 (3d Cir.1980), *cert. denied,* 451 U.S. 987, 101 S.Ct. 2322, 68 L.Ed.2d 845 (1981). There are, however, two problems with such a contention: first, the Committee itself was not a sectarian group, *see* n. 1 *ante;* and second, *Gilfillan,* in the broad sweep of its language, is of questionable precedential value in the post-*Lynch* era.

**22.** It is worthy of repetition that these two events, which collectively comprise the heart and soul of the plaintiffs' case, were both transitory in nature. They have come and gone, and their unhealthy aura does not linger in any tangible, meaningful, or ongoing sense. What remains is untainted. And, it is the Memorial as it stands which is at issue here. *E.g.,* n. 20, *ante.*

104 S.Ct. at 1364. Here, as in the creche case, there is no evidence of direct meddling by clerical authorities or of any input by the Roman Catholic hierarchy into the content, design, or use of the Memorial, either prior to, or after, its erection. There has been no interplay of any kind between the Church (or its surrogates) and the City. There is not a scintilla of proof of any "ongoing, day-to-day interaction between church and state." *Id.* Like *Lynch, id.* at 1364–65, no question of a "direct subsidy" is involved. And, as in *Lynch, id.* at 1364, the City's commitment of financial resources to the Memorial is *de minimis.*

To the extent that political divisiveness is still (if at all) relevant, *see* n. 18 *ante*, there is nothing to insinuate that this is a lasting problem. Indeed, the plaintiffs' key piece of evidence on this point—Busby's testimony as to purposeful defiance on the part of the WAVAW—proves too much: there is nary an indication that WAVAW is in any way joined in a battle along *religious* lines; the group's enmity is focused on anti-choice sentiments, and has, from aught that appears in this record, no connection with theology or religious preference as such.

While the overreaction which characterized the events of the autumn of 1979 demands censure, that errant behavior is not outcome determinative. Those events appear, in the neutral light of retrospect, to be isolated and misguided acts, not fairly attributable as an overall measure of municipal policy. On such a spotty record, *Lynch* simply does not permit a finding of

institutional cross-pollinization sufficient to suggest that " 'comprehensive, discriminating and continuing state surveillance' or ... 'enduring entanglement' " which the Court apparently requires at present. *Id.* at 1364, quoting *Lemon v. Kurtzman,* 403 U.S. at 619–22, 91 S.Ct. at 2114–15. Such entanglement as existed here between religion and government is not enough, when hefted on the *Lynch* scales, to tip matters in the plaintiffs' direction.

### V.

The Establishment Clause has historically been an indefatigable sentry, patrolling the actions of government to prevent incursions upon our cherished religious liberty. It has served this country well. Nowhere is the value of the Clause more keenly felt than in the nation's smallest state: a state whose origins date back to Roger Williams and his persistent struggle against the forces of intolerance and religious oppression. And, the Establishment Clause has not, in a free and open society, outlived its usefulness.

Cynics have been quick to lament perceived erosions of the Clause at various stages of our history. *Lynch*, in particular, has set off a cassandran clamor. Yet, as in the case of Mark Twain's supposed passing, the reports of the demise of the Establishment Clause in the portentous shadow of *Lynch* are greatly exaggerated. The Clause remains alive and well, although its outlines have been scumbled once again.[23]

**23.** One distinguished scholar has suggested, perhaps with some prescience, that the Religion Clauses are not necessarily peas in a pod: that in an age where, on the one hand, the state is expected to do more and more, and on the other hand, the practice of religion has become both less traditional and considerably more diversified, it may well be wise to define "religion" less expansively for Establishment Clause purposes (lest all activities of a spread-eagled government be deemed constitutionally suspect) and more expansively for Free Exercise Clause purposes (lest new variations and permutations of religious expression be placed beyond the pale of constitutional protection). L. Tribe, *American Constitutional Law,* § 14–6 at 826–831 (1978).

Professor Tribe expounds on this notion as follows:

For the free exercise clause, a dichotomy can usefully be drawn between things "arguably religious" and things not even arguably having a religious character; all that is *"arguably religious"* should be considered religious in a free exercise analysis. For the establishment clause, an analogous dichotomy distinguishes all that is "arguably non-religious" from all that is clearly religious; anything *"arguably non-religious"* should not be considered religious in applying the establishment clause. Thus, when a government program has the effect of fostering, tolerating, or encouraging—but not mandating—an activity, the fact that the activity is only *arguably* reli-

Even so, the case at bar has been nettlesome. Recognizing that "(n)o significant segment of our society and no institution within it can exist in a vacuum or in total or absolute isolation from ... government," *Lynch*, 104 S.Ct. at 1359, the end product complained of by these plaintiffs—whose sincerity the court does not question—is bland. This court does not share the plaintiffs' impression that the Memorial, dispassionately viewed, constitutes a theistic symbol. Fair-minded appraisal of the fountain and its accountrements does not conduce to the conclusion that "it establishes a religion or religious faith, or tends to do so." *Id.* at 1361. The fruit of the Committee's efforts, seen in the refracted afterglow of *Lynch*, is not a shrine, but simply another piece of municipal decoration, permissible under the Clause for the reasons indicated above. There is no warrant, given the current state of the law, to bar its continued display, maintenance and preservation by the City or to declare it unconstitutional.

Still, the events of October 7, 1979 and of November 6, 1979 leave an unpleasant taste. The fact that the Memorial itself does not run afoul of the Establishment Clause in no way excuses or condones the excesses of the participants in those events. To the contrary, that conduct disserved the legitimate ends of the project itself, and cast a dark cloud over the bona fides of the entire venture. While this court has earlier remarked upon the need to exercise caution not "to toss the treasure along with the trash," *see* text *ante*, trash must nevertheless be recognized for what it is. The municipal officials involved should be ashamed of their part in certain of the events of late 1979. Had those persons been more catholic in their views and expressions, and less defensively Catholic at the times in question, the City might

gious is *not* enough to make the government program a violation of the establishment clause; as long as the activity is arguably *not* religious, the establishment clause has not been violated by its facilitation.

L. Tribe, *op. cit. supra,* at 828 (emphasis in original) (footnote omitted).

well have been spared the rancor of this unnecessary litigation.

Consonant with the foregoing, the plaintiffs' various prayers for relief are denied; the complaint is dismissed with prejudice; and the clerk is directed to enter judgment in favor of the defendants for costs.

*Lynch* may well be an omen that such a dichotomy is on the horizon. Certainly, the *Lynch* Court's observations that the creche is not "explicitly discriminatory," *Lynch*, 104 S.Ct. at 1366 n. 13, or "motivated wholly by religious considerations," *id.* at 1362, are reminiscent of Tribe's "arguably non-religious" stratification.