MAGNALEASING, INC.,
Plaintiff-Appellee,

v.

STATEN ISLAND MALL, Blackfriars
Realty Corp., and Tottenham Realty
Corp., Defendants-Appellants.

No. 133, Docket 77–7217.

United States Court of Appeals,
Second Circuit.

Argued Oct. 6, 1977.

Decided Oct. 14, 1977.

James M. Bergen, New York City (Jeffrey Newman, and Marshall, Bratter, Greene, Allison & Tucker, New York City, of counsel), for defendants-appellants.

Thomas A. Butler, New York City (Lon S. Bannett, and Keane & Butler, New York City, of counsel), for plaintiff-appellee.

Before KAUFMAN, Chief Judge, and GURFEIN and MESKILL, Circuit Judges.

PER CURIAM:

Magnaleasing, Inc., a wholly owned subsidiary of the Magnavox Company engaged in the business of leasing property for use by Magnavox and its retail distributors, brought this diversity action under New York law claiming that the Staten Island Mall had fraudulently induced it to enter into a lease. It asserted that the Mall misrepresented the rate and volume of leasing at the Mall and its estimates of common area and real estate tax charges. Judge MacMahon granted judgment for the plaintiff, rescinding the fifteen year lease between Magnaleasing and the Mall. He referred the question of damages to a special master, and he subsequently confirmed a damage award of $156,769.99 to Magnaleasing.

I.

On November 2, 1972, John Kelly, an assistant manager of Magnavox (and, subsequently, the Vice President of Magnaleasing) wrote to Feist & Feist, the developer of the Mall and its leasing agent, about the

prospect of renting space. The Mall, a two story enclosed structure, was then under construction. Two weeks later, George Kirtland, a licensed real estate broker employed by Feist & Feist, responded to Kelly's inquiry and sent him leasing plans, demographic data on Staten Island, and two advertising brochures dated, respectively, August 1972 and November 1972. These brochures stated that more than fifty per cent of the Mall had been leased.

Encouraged by these representations, Kelly arranged for a meeting with Kirtland, held on December 4, 1972. At this meeting, which was attended by several Magnavox representatives, a leasing plan, containing store locations, was shown to Kelly. On this plan, areas already leased were designated by a large black dot or by the name of a future tenant. Over sixty percent of the space was so marked. In addition, Kirtland explained that other stores had signed leases subsequent to the printing of the lease plan, and the names of these new tenants, supplied by Kirtland, were entered by John Kelly in the appropriate spaces. In all, over 65% of the Mall space appeared to be committed.

Each of these representations regarding the amount of leased space was contradicted by Feist & Feist's internal figures. In August 1972, when the advertising brochure stated that more than 50% of the Mall was leased, signed leases actually covered only 15% of the space; and, in November, 1972, when the representation was repeated, less than 32% of the Mall space was committed. In December, 1972, when Kirtland pointed out that the Mall was 65% leased, less than half that area was actually rented.

At the crucial meeting on December 4, 1972, the financial aspects of the deal were also discussed. Kirtland proposed a base rent of $7.50 per square foot, and noted that each tenant would have to pay a proportionate share of taxes and common area charges. Kirtland estimated that, at the inception of the lease period, taxes would be $1.25 per square foot, and that common area charges, which covered the costs of heating, lighting, maintaining and protect-

ing the general Mall area, would be $.65 per square foot. John Feist, the Vice President of Feist & Feist, had explicitly instructed his salesmen to use these estimates in discussions with potential tenants, despite internal memoranda, prepared by the comptroller of Feist & Feist, Don Faughnan, and the Mall's construction chief, Ed Fraher, which strongly suggested that they were grossly inaccurate. Moreover, just two weeks after Kirtland spoke with the Magnavox representatives in December, John Feist sent a confidential memoranda to Irving Feist, his father and President of the leasing company, expressing dismay at the most recent tax estimate of $2.34 per square foot. He warned: "If we're going to have taxes like this (in addition to the common area and everything else), we're certainly going to have problems with our tenants."

Unaware of these internal figures, Magnaleasing proceeded in their negotiations with the Mall and, after extended discussions, signed a fifteen year lease, whose term was to commence in August, 1973. This lease provided for a base rent of $6.50 per square foot, but contained no provision limiting additional costs. The sections which deal with those additional charges require only that the landlord bill the tenants in accordance with its own estimates and then, at the conclusion of a lease year, backbill the tenant for the differences between actual and projected charges.

Feist & Feist's internal predictions proved far more accurate than their representations, and costs were 200–300 per cent greater than claimed. Magnaleasing protested each time it learned of the differences between the charges represented to it and the actual charges. In the Fall of 1973, Magnaleasing sent a letter to the Mall complaining of the high initial tax charges and, in April, 1974, John Kelly sent Feist & Feist a detailed letter outlining Magnaleasing's complaints about the tax rate and the initial backbilling of common area charges. Finally, Magnaleasing stopped paying additional charges over the estimates in August, 1974, precipitating a successful suit by the

Mall against Magnaleasing to recover rent arrears. Magnaleasing then abandoned the Mall store, and on December 14, 1974, the instant action was commenced.

On the basis of these facts, Judge MacMahon held that Feist & Feist had induced Magnaleasing to enter its lease by deliberately misrepresenting the rate and volume of leasing at the Mall and its estimates of common area charges. Judge MacMahon granted recission and ordered a reference on the issue of damages. Martin Jacobs, the special master, accorded damages representing the cost of improvements less depreciation and the difference between the charges represented by Feist & Feist and those actually paid, and his report was confirmed by Judge MacMahon.

## II.

While the Mall mounts an ingenious and exhaustive attack on Judge MacMahon's findings and holdings, we are not swayed by any of its arguments. In our view, only two of appellant's contentions require comment: whether Magnaleasing's complaint should have been dismissed as a matter of law, and whether Judge MacMahon's factual findings were clearly erroneous.

The Mall contends that the representations regarding tax and common area charges were expressions of future expectation upon which a finding of fraud cannot be predicated. Citing a long list of New York precedent, it argues that only statements of existing fact are actionable. It is a hornbook principle, however, that statements of opinion may constitute actionable fraud where a present intent to deceive exists. *Gray v. Richmond Bicycle Co.,* 167 N.Y. 348, 357, 60 N.E. 663 (1901). When John Feist told his employees to quote the very modest figures for additional rent charges, he knew, from the many internal memoranda circulated, that those were not his firm's true figures. Apart from the additional rent charges, there is no doubt that the representations regarding the amount of space leased at the Mall are actionable.

The Mall's only other argument which warrants comment is that the trial court's findings of fraud are not supported by the record. Of course, in reviewing findings of fraud, we cannot set them aside under Rule 52 of the Federal Rules of Civil Procedure unless they are clearly erroneous. Here, the evidence in the record is more than ample to support Judge MacMahon's findings. Magnaleasing's representatives testified at length concerning the representations made by the Mall, and a substantial number of the Mall's internal memoranda were introduced into evidence. Moreover, John Feist's testimony was of great significance. His statements provided additional evidence that Feist & Feist, in instructing its salesmen and in circulating the brochures, disseminated misleading information.

We have carefully reviewed the record on appeal, and finding no merit in the Mall's other arguments, we affirm.