Thomas F. DOOLEY, III, et al., Plaintiffs,

v.

Stafford S. QUICK, Defendant.

Civ. A. No. 84–0057 S.

United States District Court, D. Rhode Island.

Nov. 19, 1984.

Thomas F. Dooley, III, pro se.

Donald R. Coulter, pro se.

George M. Cappello, Chief Counsel, R.I. Dept. of Corrections, Anthony C. Cipriano, Asst. Counsel, Cranston, R.I., for defendant.

## OPINION AND ORDER

SELYA, District Judge.

This prisoner petition was filed pro se on February 9, 1984 by Thomas F. Dooley, III and Donald R. Coulter. Both Dooley and Coulter were convicted on state felony charges. They were each sentenced to serve lengthy terms of incarceration and have been confined at the High Security Center (Center) of the Adult Correctional Institution (ACI), Cranston, Rhode Island, a state penal facility.[1]

---

1. Shortly before the Rule 53(e)(2) hearing in this court (but subsequent to the completion of proceedings before the master), Coulter completed service of his sentence. He was released from the ACI on October 14, 1984. To the extent that Dooley (who remains incarcerated)

The sole named defendant is Stafford S. Quick, an associate director of corrections of the state of Rhode Island and the associate director of the Center. Quick is sued both individually and in his official capacity. While the plaintiffs purport to sue "any and all others that may be directly or otherwise involved in depriving the plaintiffs [of] their constitutional guarantees," Complaint at 4 ¶ 9, there is no indication that any putative defendant other than Quick has been served.

This case is one which implicates vital concerns: the need of a large, crowded penitentiary to maintain order and security; the pervasive threat which homosexuality poses in a custodial environment; and the right of prisoners—even overtly gay prisoners—to enjoy the benefits of the Constitution consistent with the legitimate constraints inherent in sound penological management. The "high ground of constitutional principle," *Marcello v. Regan*, 574 F.Supp. 586, 596 (D.R.I.1983), is all too easily beclouded when issues which, even in the abstract, kindle fiery emotions are viewed in the bright glare of such highly-charged elements as violent crime, hardened criminality, and unabashed homosexuality. Yet, the Constitution knows no sexual preference; and purely "subjective judgments are a luxury which the courts cannot indulge." *Id.*

The matter is presently before the court for action on the memorandum and recommendations (Report) of a special master, Hon. Frederick DeCesaris, filed July 19, 1984. *See* Fed.R.Civ.P. 53(e)(2). Since the antecedents of the litigation are tangled, however, the court turns first to an exploration of the road which led to this juncture.

## I. PROCEDURAL BACKGROUND.

Dooley and Coulter filed their original suit in the United States District Court for the District of Rhode Island on August 10, 1982. *Dooley v. Moran*, C.A. No. 82–0518 (*Dooley I*). *Dooley I* raised, inter alia, allegations of harassment and discriminatory treatment stemming from the plaintiffs' homosexual orientation, and dealt with events which ostensibly occurred during a narrow time frame of less than one month, commencing June 28, 1982. The suit lay dormant for an extended interlude.

The docketing of the instant action in early 1984 was accompanied by the filing of a motion for a temporary restraining order. Fed.R.Civ.P. 65(b). This court denied interim injunctive relief, *Dooley v. Quick*, C.A. No. 84–0057, slip op. at 2 (D.R.I. Feb. 14, 1984) (*Dooley II*), but simultaneously appointed a magistrate of this court to act as a special master, *see* Fed.R.Civ.P. 53(f), instructing the master to exercise all of the powers enumerated in Rules 53(c) and (d). *Dooley II*, slip op. at 2–3. The master was directed "upon the conclusion of his investigation" to "file with the court his report, ... including specific recommended findings of fact and recommended conclusions of law." *Id.* at 3.

Subsequent to the entry of the order of reference, *Dooley I* was transferred to this court's calendar. Immediately thereafter, the order of reference was expanded to encompass the earlier case as well. *See Dooley I*, Order of April 4, 1984.

The master held an evidentiary hearing at the ACI on May 16, 1984. He filed the Report some two months later. The master likewise filed a tape recording of the May 16 hearing. The plaintiffs were grant-

has standing to press the issues before the court, Coulter's departure from the penitentiary is immaterial. *Cf. Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160, 102 S.Ct. 205, 212, 70 L.Ed.2d 309 (1981); *Donnelly v. Lynch*, 691 F.2d 1029, 1032 (1st Cir.1982), *reversed on other grounds*, —— U.S. ——, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984); *Fausto v. Diamond*, 589 F.Supp. 451, 459–60 (D.R.I.1984). And, insofar as Coulter claims entitlement to money dam-

ages, his action plainly survives the termination of his incarceration. *See, e.g., Memphis Light Gas & Water Division v. Craft*, 436 U.S. 1, 8, 98 S.Ct. 1554, 1559, 56 L.Ed.2d 30 (1978); *Powell v. McCormack*, 395 U.S. 486, 495–96, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); *Liner v. Jafco, Inc.*, 375 U.S. 301, 305–06, 84 S.Ct. 391, 394, 11 L.Ed.2d 347 (1964); *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 459, 77 S.Ct. 912, 919, 1 L.Ed.2d 972 (1957).

ed an extension of time to respond to the master's recommendations, and eventually served their objections to the Report on August 27, 1984. Upon preliminary review of the pleadings, the Report, the objections, the tape, and all exhibits and supporting materials, the court dismissed *Dooley I*, holding in substance that all of the claims asserted therein were either (i) waived, unsupported, non-justiciable, or unproven, on the one hand, or (ii) subsumed by the instant suit, on the second hand. *Dooley I*, slip op. at 2–3 (D.R.I. Oct. 25, 1984). All overlapping claims, to the extent that they had not been waived, were preserved for consideration in the case now at bar. *Id.*, slip op. at 3–4.

On November 7, 1984, this court held the confirmation hearing required by Fed.R. Civ.P. 53(e)(2).

## II. THE ISSUES.

The complaint herein, viewed generically, raises a trio of issues.[2] The plaintiffs contend, first, that they have been victimized by reason of their sexual preferences. They next argue that they have impermissibly been denied access to the courts. And finally, Dooley asseverates that his First Amendment rights in and to publications of his choice have been abridged by over-strict censorship. The defendant has denied each and all of these claims. While the plaintiffs' assertions admittedly overlay one another to some extent, the court will endeavor to address each group of contentions separately. Before so doing, however, it seems advisable to set out the standard of review.

## III. STANDARD OF REVIEW.

■ Fed.R.Civ.P. 53(e)(2) directs that, in a non-jury action such as the present one, "the court shall accept the master's findings of fact unless clearly erroneous." *Id.* See *N.L.R.B. v. J.P. Stevens & Co.*, 538 F.2d 1152, 1160 (5th Cir.1976); *Krins-*

ley v. United Artists Corp.*, 225 F.2d 579, 582 (7th Cir.1955); *In re Rice Barton Corp.*, 312 F.Supp. 1316, 1318 (D.Mass. 1970). The parties excepting to the factual findings of a master carry the burden of proving those findings to be beyond the pale. *Oil, Chemical & Atomic Workers International Union, AFL–CIO v. N.L. R.B.*, 547 F.2d 575, 580 (App.D.C.1976), *cert. denied*, 431 U.S. 966, 97 S.Ct. 2923, 53 L.Ed.2d 1062 (1977); *Badger By-Products v. Employers Mutual Casualty Co.*, 64 F.R.D. 4, 6 (E.D.Wis.1974), *aff'd*, 519 F.2d 1406 (7th Cir.1975). And, while the district court is not bound by the findings of such a master, those findings (albeit short of the effect of a jury verdict) are entitled to special weight and deference. *Carpenter v. Union Ins. Soc. of Canton, Ltd.*, 284 F.2d 155, 159 (4th Cir.1960). The receipt of further evidence rests in the sound discretion of the court. Fed.R.Civ.P. 53(e)(2). See, e.g., *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331–32, 91 S.Ct. 795, 802–03, 28 L.Ed.2d 77 (1971); *Magnaleasing, Inc. v. Staten Island Mall*, 428 F.Supp. 1039, 1045 (S.D.N.Y.) *aff'd*, 563 F.2d 567 (2d Cir.1977).

■ If the district court accepts the master's report generally, it may nonetheless modify and supplement his findings. *Guaranty Trust Co. v. Seaboard Air Lines Ry. Co.*, 53 F.Supp. 672, 696 (E.D.Va. 1943), *aff'd*, 145 F.2d 40 (4th Cir.1944), *cert. denied*, 323 U.S. 797, 65 S.Ct. 440, 89 L.Ed. 636 (1945). The court's added findings, however, must also be based on evidence contained in the record. See, e.g., *United States v. Merz*, 376 U.S. 192, 199, 84 S.Ct. 639, 643, 11 L.Ed.2d 629 (1964), *United States v. Tampa Bay Garden Apartments, Inc.*, 294 F.2d 598, 603 (5th Cir. 1961). It is against this well-lit backdrop,

---

**2.** The plaintiffs have, from time to time, filed supplemental complaints, and continue to do so. Inasmuch as all of these postdate the filing of the defendant's answer, and since none of them were sanctioned by the court on motion and notice as required, Fed.R.Civ.P. 15(d), the court will ignore all such supplementary claims as

mere surplusage, except to the extent that the master permitted evidence to be taken thereon. *Cf. Friedman v. Typhoon Air Conditioning Co.*, 31 F.R.D. 287, 289–90 (E.D.N.Y.1962) (requiring that the defendant not be prejudiced by the allowance of supplemental pleadings).

then, that the court turns to consideration of the issues at hand.

## IV.   DISCRIMINATION CLAIMS.

Dooley and Coulter allege that they have each been perceived within the ACI as possessing a homosexual orientation, and consequently, that they have been the targets of varied official activities aimed at making prison life extraordinarily uncomfortable for them.   These acts, the plaintiffs say, collectively comprise an invidious pattern and practice of discrimination, designed to strip away their constitutionally-protected rights.

There are two types of arrows in the plaintiffs' discrimination quiver.   The first aims at impermissible interference with rights of expression and communication; the second targets harassment.   Upon close inspection, neither projectile flies straight and true.

The master dealt with both of these claims in the Report, and the court has carefully examined the underlying evidence.   Based on this review, the court concludes, for the reasons set out below, that the master's findings of fact on this segment of the case cannot in any way be interdicted under the "clearly erroneous" rule; and that, taken in their ensemble, the plaintiffs' assertions, to the extent proven at all, do not rise to a level of constitutional dimension.   Though this part of their complaint must therefore be dismissed, the gravity of the charges is such that detailed perscrutation is warranted.

### A.   *Communication.*

■ The plaintiffs allege in the vaguest of terms that they have been denied the right to "freely express and communicate." [3]   They complain that they have been booked for attempting to communicate with each other by passing a letter and, on at least two occasions, for wig-wagging hand signals to one another through a glass window.   This, they protest, evi-

dences the repression to which they have been subjected.

But, the plaintiffs were housed in different units at the Center; and intra-departmental mail between inmates is not authorized, except under special circumstances.   *See* Rhode Island Department of Corrections Operational Memoranda (RIDCOM), No. 5.17.03.   This regulation itself is not in issue, *cf. Rudolph v. Locke,* 594 F.2d 1076, 1077 (5th Cir.1979), as Dooley and Coulter do not challenge its validity per se; rather, they remonstrate that it has been utilized unfairly in their case.   The proof in no way bears out this allegation.

Furthermore, the prison regulations plainly list the passing of contraband as a "punishable offense," and there has been no evidence or argument that unauthorized intra-prison letters are not contraband. The booking was clearly in accord with prison regulations which Dooley and Coulter have never challenged.   The plaintiffs offered no evidence that the rules have been selectively applied to prevent their communication with one another, or that other similarly situated guests of the state are treated differently.   From aught that appears of record, the ACI's response to this forbidden piece of correspondence was precisely the same as its handling of any other unauthorized prisoner-to-prisoner note.

The principles which govern the bookings relating to the plaintiffs' efforts to engage in chirology through the window are not so clearly laid out.   No specific written regulation expressly forbids the use of such a see-through mode of communication.   Yet, Lt. Yakey testified that he understood that it was institutional policy not to allow such interplay and that the policy had been applied to all inmates in all events.   Quick, in his testimony, emphasized that the Center was designed on the module concept and that communication between the residents of different modules (an integument into which Dooley and Coulter neatly slip) has

---

**3.**   To the extent that this averment relates to the plaintiffs' requests to confer in order to plan and implement the litigation in which they have

been allied, it will be dealt with in Part V(B) hereof, *post.*

historically been discouraged for security reasons. While this teapot tempest might have been avoided by the simple expedient of properly commemorating the stated policy as a specific regulation distinctly communicated to the inmates (as has now been done), there is nothing in the record of this case which can bear the weight of a constitutional claim in this regard. The plaintiffs have not charged that the policy was applied to them in a discriminatory manner; they complain merely that the policy was unknown to them until they were booked. But, even this claim is suspect since the plaintiffs obviously knew that communicating through the window was prohibited by the time of the second incident; they had, by then, been served with notice of disciplinary proceedings anent the first such infraction. Furthermore, after the bookings and consonant with the *Morris* Rules,[4] the plaintiffs were afforded disciplinary hearings at which they could have raised their objections. They opted not to do so. The penumbras of the Constitution have not been breached.

■ Underlying these plaints, however, is a thinly-veiled argument that there exists a constitutionally-assured right of prison inmates to communicate with each other in a virtually unrestricted manner, even in a high security institution. No such right exists. While it is true that a convict "retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system," *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974), that is not to say that the prison administration is powerless to regulate communication in the penal environment. The managers of the institution may limit expression as reasonably required to maintain security, preserve internal order, implement discipline, enhance safety, and further the goals of prisoner rehabilitation. *Procunier v. Martinez*, 416 U.S. 396, 412, 94 S.Ct. 1800, 1810, 40 L.Ed.2d 224 (1974).

■ Though restrictions may be no more intrusive than reasonably necessary in order to effectuate legitimate policies and objectives, *id.* at 413, 94 S.Ct. at 1811, the evidence in this case shows (and the plaintiffs acknowledge) that the policies and practices of the Center do not entirely eliminate the possibility of communication between inmates separated by module assignments. The residents of different modules may mix in the yards during their recreation times, in crafts classes, during bible study, and in the college courses offered at the ACI.[5] As long as a reasonable opportunity for some communication or variety of contacts within the prison exists, decisions about how and when inmates may see and/or contact other inmates are clearly within the wide discretion which the institution's officials must necessarily possess. This is, at bottom, precisely the sort of administrative decision which is best left to the trained custodial professionalism of correctional managers, rather than to the courts. *See, e.g., Bell v. Wolfish*, 441 U.S. 520, 547–48, 99 S.Ct. 1861, 1878, 60 L.Ed.2d 447 (1979); *Jones v. North Carolina Prisoners' Labor Union*, 433 U.S. 119, 128, 97 S.Ct. 2532, 2539, 53 L.Ed.2d 629 (1977); *Procunier v. Martinez*, 416 U.S. at 404–05, 94 S.Ct. at 1807.

---

**4.** In *Morris v. Travisono*, 310 F.Supp. 857 (D.R.I. 1970), the court addressed conditions of confinement at the ACI. This effort resulted in a consent order, entered in 1972, setting forth the regulations which currently govern the administration of the penitentiary in substantial part. These regulations may be found in a recent permutation of this long-playing litigation. *Morris v. Travisono*, 499 F.Supp. 149, 161–74 (D.R.I.1980).

**5.** At the evidentiary hearing, the plaintiffs sought to twist this permissiveness to their advantage. They seemed to argue that the fact that inmates could communicate in some places under specified circumstances—but not from one module to another—constituted a form of discrimination in and of itself. That asseveration is unadulterated sophistry. Allowing inmates to chat through a fence during yard time does not by some quirk of alchemy obligate the institution to allow the module windows to be similarly employed for communicative purposes.

This court does not question the sincerity of the plaintiffs' sense of deprivation arising out of their inability to communicate with each other as freely as they wished to do; but, that sort of injury, if injury it be, is not tantamount to a constitutional claim. Imprisonment carries with it the circumscription or loss of many significant rights. *Hudson v. Palmer,* —— U.S. ——, 104 S.Ct. 3194, 3199, 82 L.Ed.2d 393 (1984); *Bell v. Wolfish,* 441 U.S. at 545, 99 S.Ct. at 1877. As the Court has recently reiterated, "constraints on inmates, and in some cases the complete withdrawal of certain rights, are justified by the considerations underlying our penal system." *Hudson,* 104 S.Ct. at 3199, *citing Price v. Johnston,* 334 U.S. 266, 285, 68 S.Ct. 1049, 1059, 92 L.Ed. 1356 (1945). "Incarceration, after all, itself impedes the exercise of a variety of freedoms—as well it should. The Constitution requires that correctional facilities meet certain minimum standards of decency—not that they cater to the individual preference of each inmate ... A jail is, when all is said and done, a penal institution maintained for the purpose of imprisoning those who have committed various wrongs against society and thus are receiving their just desserts; it is [not] a country club...." *Chase v. Quick,* 596 F.Supp. 33, 35 (D.R.I.1984).

These plaintiffs have been housed in the most secure wing of the ACI. In keeping with the *Morris* Rules, they possessed all of the rights and privileges appurtenant to their status as "A" prisoners in the Center—no less, but no more. So long as the plaintiffs remained resident at the Center (and no cognizable challenge to their classification has surfaced), the scope, extent and degree of their rights had to be balanced against the particular needs of the institution. The curtailment of certain liberties such as took place here was plainly necessary to accommodate a myriad of "institutional needs and objectives" of prison facilities—chief among which is internal security. *Hudson,* 104 S.Ct. at 3199 (citations omitted). The module-to-module communicatory restraints in effect at the Cen-

ter were a reasoned exercise of administrative power.

Moreover, Dooley's and Coulter's classification was largely dependent on the nature of their crimes and on how they comported themselves as inmates. Their privileges (including opportunities for more frequent contact with a greater number of people) have been similarly dependent upon their own behavior. While their confinement has been involuntary, the degree of restriction inherent therein and the scope of their in-house freedoms relate in substantial part to the plaintiffs themselves, and on how they conformed—or failed to conform—their conduct to the legitimate demands of prison life. This is as it should be: as *Chase* teaches, a prison is not a country club, and convict "membership" is not by choice. There must be rules to insure order and security in the potentially turbulent environment of the penitentiary, for the only alternative is chaos. So long as the regulatory scheme is rationally related to valid objectives of prison management and administration, and intrusion upon individual rights is suitably minimized, the rules must be enforced. Rewarding inmates who abide by these rules with "easier" time (for example, greater freedom of communication) is a permissible carrot for correctional officials to dangle, at least where (as here) the practice is implemented in an even-handed manner.

Nor is the placement of Dooley and Coulter in disparate units evidence of the discrimination of which they grieve. Prison officials are generally concerned about homosexual contact within *any* sector of the prison, considering such incidents to be a grave threat to institutional discipline and security. These concerns are founded in reason, experience, and common sense.

Evidence in the record revealed that the plaintiffs had once lived in the same module, but that they were separated following reports of homosexual activity. The plaintiffs never explicitly denied engaging in such sexual inversion, and the record supports an inference of their homoeroticism. The curtailment of sexual activity is

almost inevitably a consequence of imprisonment; even these plaintiffs have not attempted to argue that they have a right to engage in homosexual conduct within the walls of the ACI. And, testimony at the hearing indicated that ACI supervisory personnel attached considerable importance to keeping the aisles and areas between the modules clear and unobstructed. In point of fact, the primary purpose of the module system is to house small groups of prisoners in contained zones which are easier to control than the sprawl of corridors and passageways which mark more conventional (and less highly secure) components of the institution. In such a setting, and with this particular prison population, the administration must be ever vigilant about facilitating the containment concept. The flip side of this coin is, of course, the need for restrictions on permitting inmate convocations of any sort (trysts included).

Regulations which allow limited, easily-supervisable contact are perfectly consistent with the underlying objectives of the penal system. The plaintiffs had no right to more frequent contacts under circumstances which might jeopardize institutional security. Within extremely broad boundaries, it is the administration—not Dooley and Coulter—who must be the arbiters of what is "reasonable" in this regard. The plaintiffs' claims of discrimination vis-a-vis generic interpersonal communication are groundless and the Report is inexpugnable in this respect.

## B. *Harassment.*

■ In addition to their assertions of a presumed right freely to communicate and to express themselves, the plaintiffs have described a series of incidents which they claim constituted harassment based on sexual preference. These include guards failing to process grievance forms; verbal and physical abuse of Dooley by corrections officers; the posting of a naked woman's photograph on Dooley's identification picture; the desecration of Dooley's legal papers by an officer; and frequent strip searches on leaving the library.

The master found, and the court accepts, that the claim of improper denial of grievance rights was not supported by the evidence. During the past two years, the plaintiffs have submitted an enormous number of grievances covering a wide range of issues. The proof strongly suggests that any isolated refusal to process a grievance form has been based on the fact that the particular complaint was not grievable. While the court recognizes both the desirability of an internal grievance procedure and the imperatives of prisoner access to that anodyne, some semblance of order must prevail. Here, too, a convict must live by the rules.

Furthermore, the plaintiffs have successfully used the grievance procedure to resolve many of the remonstrances limned in their complaint. Dooley has complained several times of verbal abuse by corrections officers; and the proof shows that Quick has made it clear that such conduct will not be condoned. Dooley, in turn, has indicated his satisfaction with the defendant's responses.

Dooley also grieved the posting of the naked woman's photograph both to Quick and to the warden (Ellerthorpe); the picture was removed immediately. There is not a shred of evidence that those with administrative responsibility for the operation of the Center either set in motion or knowingly condoned a pattern and practice of harassment, or that they looked the other way when random episodes such as this occurred. On the record at bar, the administrators do not deserve to be pilloried on this point; to the contrary, they are to be commended for their observance of the *Morris* Rules and their careful remedial attention to prisoners' grievances.[6]

---

**6.** It is, nevertheless, somewhat troubling to note the number and repetition of such incidents. While the *Morris* procedures have been properly followed so as to correct any wrongs episodically committed by the guards, these are but post hoc solutions. The fact that an inmate may obtain redress after he has been harmed does not excuse prison officials from their duty to make good-faith efforts to prevent the harm in the first place; the corrective function of the

The vignette of the pummeled papers is similarly explicable. While it does appear that Dooley's documents were strewn about the library, there is nothing to suggest that they were so treated because they belonged to a homosexual inmate. The guard at whom the finger was pointed, Officer Magnum, testified that he rummaged through the plaintiff's files during a general prison search, and that he did not know whose papers they were. There is no basis in the record for any contrary inference. Nor has any challenge been presented to Magnum's authority to conduct such a generalized investigation. However frustrating this situation may have been, it cannot be blown up to constitutional proportions. Even if some materials were destroyed, Dooley would at best have a state law tort claim. And, this court would have no jurisdiction. *Parratt v. Taylor*, 451 U.S. 527, 541–43, 101 S.Ct. 1908, 1916, 68 L.Ed.2d 420 (1981); *Bonner v. Coughlin*, 517 F.2d 1311, 1318 (7th Cir.1975), *modified*, 545 F.2d 565 (1976) (en banc), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978).

■ Lastly, the evidence clearly indicated that the overall series of strip searches objected to by the plaintiffs were directed at the entire prison population. The February, 1984 searches of people leaving the library were based on the justifiable suspicion that contraband was being passed there, and were carried out for less than two days. The record is admittedly somewhat murkier with respect to the plaintiffs' complaints about the April, 1984 searches, but there is absolutely nothing to insinuate that these explorations were directed at Dooley and Coulter in particular.[7] In any event, the curtailment of privacy rights is indisputably a consequence of incarceration, *see Hudson*, 104 S.Ct. at 3200–

01, and prison officials must retain the ability to institute searches in order to maintain security. *See Bell v. Wolfish*, 441 U.S. at 558, 99 S.Ct. at 1884 (upholding prison strip searches). The instant searches were of relatively brief duration, and were conducted in a typical fashion. Given the circumstances, they represented a rather minimal intrusion upon the inmates. *See Arruda v. Fair*, 710 F.2d 886, 887–88 (1st Cir.), *cert. denied*, —— U.S. ——, 104 S.Ct. 502, 78 L.Ed.2d 693 (1983) (upholding a prison policy of strip-searching inmates entering or leaving the unit, going to or from the prison law library, infirmary and visiting rooms). The plaintiffs have utterly failed to show either that these searches in particular, or that seek-and-hunt policies and practices in effect at the ACI in general, unlawfully abridged their constitutional guarantees.

For these reasons, the plaintiffs' claims of discrimination based on their deviant sexual preferences are uniformly unproven and the master's Report, insofar as it recommends rejection of these contentions, is not clearly erroneous. The Report is, on these points, accepted, sustained and confirmed. Accordingly, so much of the plaintiffs' complaint as charges violations in this respect must be, and it hereby is, dismissed.

## V. ACCESS TO THE COURTS.

In support of their broadside declamation that they were denied access to the courts, the plaintiffs have served up a ragout of arguments. First, they claim that they have been chivied by correctional officers determined to hamper the plaintiffs' work on this case. Such persecution is alleged to have consisted of four main ingredients, viz., (i) failure to deliver the plaintiffs' legal letters to one another, (ii) dispersal of Doo-

---

*Morris* Rules has consequences for prison administrators beyond the immediate violations being addressed from time to time. Awareness, actual or constructive, of potentially incendiary conditions can impose a responsibility upon those in command to take preventative action before the fact; at some point (not reached in this case), proof that supervisors acted with celerity to put out flash fires may not be enough.

7. It is worth noting that Dooley himself takes credit for bringing about an end to those expeditions, claiming that his grievances on the subject were followed by their termination. Implicit in this self-approbation is a recognition that Quick acted in good faith.

ley's legal papers during the course of a general library search, (iii) despoliation of the typewriter used by the inmates in the preparation of cases, and (iv) confiscation of Dooley's and Coulter's legal papers by a correctional officer. Second, the plaintiffs argue that they have not been permitted to meet and discuss their suit, thereby hindering their trial preparation efforts. Finally, the plaintiffs decry the denial of Dooley's requests for the assistance of a particular "jailhouse lawyer" (inmate Anthony J. Souza). To the extent not dealt with in Part IV hereof, *ante,* the court will treat each of these protestations seriatim.

### A. *Persecution.*

█ The master found, and the court accepts, that there was no evidence of a concerted plan of harassment designed to prevent these litigants from reaching the courthouse steps. To appreciate the frailty of the plaintiffs' theses in this regard, it is necessary to dissect the proffered argument by inspecting each of its four component parts.

The court recognizes, of course, that while intra-departmental mail between inmates is not generally authorized, detainees involved in the same litigation do have the right to correspond in reference to the case. *See* RIDCOM, No. 5.17.03. But, the proof in this case simply did not demonstrate that the plaintiffs' letters to one another had failed of delivery. No showing has been made that the ACI's operational guideline was transgressed, or that the plaintiffs' correspondence with each other was frustrated.

While the evidence did reveal that Dooley's papers had been strewn about, there was nothing to indicate that this occurrence was part and parcel of a scheme of bedevilment. The fair implication of the testimony is well to the contrary. *See* text *ante* at Part IV(B). The scattering of these papers seems to have been an unfortunate consequence of a necessary and legitimate prison search rather than a denial of court access.

The same analysis tells the tale of the ruined typewriter. There was a dearth of evidence that (as plaintiffs speculate) the machine was vandalized by the guards, much less that it was deliberately broken in order to thwart the plaintiffs' work. And in any event, the matter was cited in a grievance form and the typewriter was repaired immediately.

Lastly, the proof is at best nebulous as to any seizure of the plaintiffs' legal papers; and the field is barren of any facts which would make Quick liable even if a guard had perpetrated such an act. The record will not support an inference that this defendant, with regard to the plaintiffs' case materials, acted or failed to act with "reckless or callous indifference to the rights ... of the prisoners in his charge." *Clark v. Taylor,* 710 F.2d 4, 9 (1st Cir. 1983). *See also Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). The matter constitutes at most the basis for a state law claim, not one within this court's jurisdiction. *Parratt v. Taylor, supra; Bonner v. Coughlin, supra.*

### B. *Meetings and Discussions.*

█ There can be little question on this record but that these plaintiffs have been denied suit-related meetings. The ACI does not totally prohibit those prisoners who have combined in bringing litigation from assembling. But, in order to meet with a co-party, an inmate must first request and receive permission through channels. These channels invariably involve Quick, who must assess each such supplication in the light of institutional security concerns before allowing or disallowing the same. In respect to the propriety *vel non* of the refusals, charges and countercharges have flown thick and fast, complicating an already tenebrous record. This court, as the master did at an earlier date, must pick its way across this tessellated battleground.

Dooley charges, essentially, that Quick's treatment of his several impetrations to meet with different inmates was crafted to hinder his access to the courts. Earlier this year, Dooley sought to huddle with

Michael Ferola, another inmate,[8] in order to prepare and file a collaborative lawsuit. Though the litigation which Dooley and Ferola allegedly aspired to joint venture was not described in any meaningful detail at the hearing, it plainly implicated issues separate and apart from those here at bar. When Quick was apprised of Dooley's desire to confer with Ferola, he asked for the case number and expected date of trial. When the plaintiff responded that he had sought the meeting in order to prepare a new case, the defendant stated (inaccurately, it would appear), "I have already responded to this." And, the record is silent as to whether Dooley pursued his avowed intention to file a case in concert with Ferola.

The averments anent the refusal of the defendant to sanction pow-wows between Dooley and Coulter take a somewhat different tack. The evidence indicated that Quick denied these requests because he believed that they had been trumped up solely to enable the plaintiffs to spend some time with each other.[9] While it is clear that the plaintiffs' close relationship and frequent attempts to communicate have posed disciplinary problems for prison officials, these incidents (and, indeed, the Ferola episode) nevertheless raise serious questions about the ad hoc approach employed by the ACI in dealing with such requests.

In the first instance (the proposed Dooley/Ferola conference), the defendant never directly answered the request; in the second case, he used his supposition about the plaintiffs' concupiscent motives as a basis for his denials. Implicit in Quick's refusal to allow meetings was a tacit assumption that the joint Dooley/Coulter suit was a mere sham. Yet, the instant action has raised questions which even counsel for the state has now acknowledged to be of a substantial nature. Quick's essentially visceral determination that the case at bar was frivolous sets a dangerous precedent.[10] A burgrave cannot, in such instances, be permitted an absolutely free hand to act as judge and jury.

In *Wolff v. McDonnell*, 418 U.S. 539, 579, 94 S.Ct. 2963, 2986, 41 L.Ed.2d 935 (1974), the Supreme Court emphasized that "[t]he right of access to the courts, ... assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." An off-the-cuff approach to inmates' requests to meet and discuss their suits, pending or potential, is too open to abuse; it puts no brake on arbitrariness and, in some cases, might deny inmates court access altogether.

Accordingly, the court directs that the ACI forthwith formulate rules clarifying the circumstances under which inmates may convene to discuss joint legal claims.[11] Such regulations should provide for prompt responses to written requests, and should

---

**8.** Ferola is no stranger to the many-splendored world of pro se prisoner petitions. He has certainly had abundant access to this court. *See, e.g., Ferola v. Moran*, C.A. No. 84–0370; *Ferola v. Octeau*, C.A. No. 84–0134; *Ferola v. Moran*, C.A. No. 83–0275; *Ferola v. Ellerthorpe*, C.A. No. 82–0443; *Ferola v. Moran*, C.A. No. 81–0150; *Ferola v. Duval*, C.A. No. 81–0041; *Ferola v. Gill*, C.A. No. 80–0089; *Ferola v. Moran*, C.A. No. 79–0406.

**9.** There was testimony that, in addition to denying the plaintiffs' formal requests to meet, Quick ordered the guards to separate them in the library. The plaintiffs were actually booked on one occasion for discussing their suit in a prohibited area, but these charges appear to have been dropped.

**10.** At the evidentiary hearing, defense counsel indicated that the prison officials were now willing to give the plaintiffs time together to work on the suit—with appropriate supervision. While this laudable solution should have been implemented in the first place, it does not erase the underlying problem. Nor does Coulter's release from prison, *see* note 1 *ante*, render Dooley's claim moot; Ferola is, after all, still incarcerated.

**11.** Indeed, the ACI has made a commendable start on this process. On November 2, 1984, apparently spurred by the master's recommended findings, state officials submitted to the court a draft of a proposed regulation designed to achieve these objectives. *See* Appendix 1. Although this proposal needs finetuning, it is a welcome first step.

require that if denials result, detailed reasons must be given.[12] Disallowances may not be related to the content of a suit, nor used as a device to screen court papers. *See Meola v. Fitzpatrick*, 322 F.Supp. 878, 884–85 (D.Mass.1971).

The court does not mean to imply that the prison administration is powerless to control the length or frequency of meetings, or to regulate the time, place, and manner in which such sessions are held, or to prevent abuses of conference privileges. The court is neither naive about the propensity of convicted prisoners to sue [13] nor unmindful of the problems which the inmate mindset often creates for the prison administration. And, those difficulties are surely heightened when homosexual liasons are threatened. Yet other equally difficult areas of prison management are subject to reasonable regulation. There is no reason to believe that considered rulemaking cannot be employed, giving to the hierarchy of the ACI the administrative latitude which is its due while at the same time affording those in custody some appropriate chance to collaborate when shared legal rights are implicated.

While the mechanism is plainly in need of an overhaul, these particular plaintiffs are not entitled to recover damages on this score. This is not a class action. Its focus, thus, is a relatively narrow one. And, the issue of denial of access in this case is directly affected by the plaintiffs' own behavior. Despite the barriers placed in their way by the prison officials, the plaintiffs did communicate inter sese on several occasions by unauthorized means. They talked with each other in the library in express defiance of the defendant's orders; passed notes to one another; and used the module window for communicatory hand signals.

■ In determining whether plaintiffs have been denied court access, the key question is whether "the challenged restriction or barrier ... deprived the litigant of meaningful access to the courts." *In re Green*, 669 F.2d 779, 785 (D.C.Cir.1981). While the procedures presently in effect at the ACI present a palpable danger of intrusion upon such "meaningful access," it has not been shown that those procedures had any substantial impact upon these plaintiffs. Quite the opposite: Dooley and Coulter have not offered an iota of proof as to specifically how, if at all, their joint effort to prosecute this case has been hamstrung. There is, on this record, a real question as to whether they needed to work together at all.

The master found that Dooley prepared all the court papers and then handled the presentation of the entire case on his own, and these illations seem supportable. Dooley admitted as much when quizzed by the court at the confirmation hearing. There is nothing to indicate that Coulter was more than a mere hanger-on or that his input was indispensible to the management of the action. The plaintiffs have never shown a reason why they needed to meet and have not directed the court's attention to any injury which they might arguably have suffered in this respect by their enforced separation. At the confirmation hearing, Dooley could point to none such. And, their claim in this regard is further weakened by the insubstantiality of their allegations of discrimination. *See* text *ante* at Part IV. Inasmuch as it was the pendency of those very contentions which

---

12. This case does not present a situation like that in *Hudson v. Robinson*, 678 F.2d 462 (3rd Cir.1982), wherein the court of appeals reversed the district court's requirement that the institution set out in its handbook procedures whereby inmates could request permission to work together. In that case, the Third Circuit found the requirement unnecessary because the institution apparently granted all reasonable requests and there was no reason to believe this policy would change. No comparable evidence has been adduced in this case.

13. *See, e.g., Braden v. Estelle,* 428 F.Supp. 595, 598 (S.D.Tex.1977):

[N]ot only are prisoners uninfluenced by the restraints which customarily deter private citizens from filing frivolous or borderline causes of actions, [but] they actually are inclined to file lawsuits and engage in 'writ writing' since this is one of the few activities left available to them which is beyond the administrative control of prison officials.

supposedly created their putative need to meet and confer, the tenuous nature of the original premise inevitably beclouds the substantiality of the conclusions which the plaintiffs now seek to have the court reach.

Likewise, Dooley has made no concrete showing of any detriment attributable to his inability to meet with Ferola.

The court is satisfied that the only relief to which these plaintiffs are entitled on this issue is declaratory and injunctive in nature. Money damages will not lie.

### C. *Jailhouse Lawyers.*

■■■ The plaintiffs stake their final argument concerning denial of judicial access on the undisputed fact that Dooley was refused the assistance of Souza, a fellow inmate and jailhouse lawyer of some renown. The history of Dooley's efforts in this respect is instructive.

Dooley made several written requests for Souza's services. The first form was co-signed by both Dooley and Souza. Quick responded that he would only process proposals signed by a single inmate. Dooley and Souza then filed separate requests. These appear to have gone unanswered. When Dooley promulgated yet another plea and simultaneously complained about the lack of a reply, Quick wrote that an answer had been sent but that it must not have reached him. Ultimately, Dooley drew up a letter detailing his attempts to get an answer to his entreaty. On March 22, 1984, the request was finally refused on three grounds, viz., (i) Dooley and Souza did not live in the same module; (ii) they did not have the same library period; and (iii) Dooley's prior history of "problems" counselled against permission.

While the extemporaneous approach is again unsettling, the essential question is whether an inmate's right of access has been infringed when he was denied the services of the specific jailhouse lawyer of his choosing. Testimony on this point was supplied both by Dooley and by Souza. The master then solicited the prison administration's viewpoint on several ancillary questions.

It is clear that the Center provides inmates with a library in which legal research may be carried out. A prison law librarian, who has completed two paralegal training courses and assists inmates "to the best of his ability," is employed at the Center three mornings a week. Souza, who was willing to assist Dooley, was employed in the library as a porter during the same hours. He was expressly barred from helping Dooley—or any other inmates, for that matter—with their legal problems while working in his prison job.

In *Bounds v. Smith*, 430 U.S. 817, 827, 97 S.Ct. 1491, 1497, 52 L.Ed.2d 72 (1977), the Court held that "the fundamental constitutional right of access to the courts requires prisons to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Emphasizing that reasonably satisfactory law libraries "are one constitutionally acceptable method to assure meaningful access to the courts," *id.* at 830, 97 S.Ct. at 1499, the Court also noted that "a legal access program need not include any particular element we have discussed, and we encourage local experimentation." *Id.* at 832, 97 S.Ct. at 1500.

Since *Bounds*, however, the question has arisen whether a law library by itself suffices to provide adequate access. In *Cruz v. Hauck*, 627 F.2d 710, 720–21 (5th Cir. 1980), the Fifth Circuit directed the trial judge to consider a convict's contention that the library (itself sufficient) could not be adequately used without at least some trained paralegal assistance. The First Circuit has not directly endorsed the higher *Cruz* standard of measuring the adequacy of library time in terms of whether inmates may engage in "meaningful legal research," *see Cepulonis v. Fair*, 732 F.2d 1, 4 (1st Cir.1984), and the *Cruz* criteria pose an open question in this circuit. *Id.* The instant plaintiffs have challenged neither the adequacy of the library per se nor the allotment of time therein available to them. (While Dooley did mention at one point that

his request for "extra" library time had been rejected, he did not show either that his request was reasonable under the circumstances or that the allocations customarily set aside for interested prisoners were in any sense niggardly). And, the fair implication of *Cepulonis* is that *"Bounds* does not create an entitlement to legal aid assistance if library access is otherwise adequate." *Cepulonis,* 732 F.2d at 6 (*citing Bounds,* 430 U.S. at 830, 97 S.Ct. at 1499).[14] The ACI, of course, offers not only a suitable library, but staffs the facility with a trained person whose responsibilities include prisoner assistance. The plaintiffs have not proven that the services of this paralegal were withheld from them. It is, therefore, unnecessary for this court to confront the vitality of *Cruz* in this circuit, as Rhode Island's system of providing its high security inmates with reasonable access to a satisfactory library presided over by a librarian with paralegal training suffices to meet both the *Bounds* requirement and the higher *Cruz* standard.

The further string to Dooley's bow, however, is his complaint that he was denied the aid of his preferred helpmate, Souza. This asseveration need not long detain the court. The requirements which the Constitution imposes upon penal institutions, while expansive, are not so elastic to stretch to the lengths that these plaintiffs suggest. No prisoner is entitled to a cafeteria-style right of selection of a jailhouse lawyer suited to his individual taste. While prisoners may be entitled in certain circumstances to inmate legal assistance, *see Herrera-Veregas v. Sanchez-Rivera,* 681 F.2d 41, 42 (1st Cir.1982), they cannot requisition the services of particular writ-writers. *See, e.g., Ervin v. Ciccone,* 557 F.2d 1260, 1262 (8th Cir.1977); *Lepiscopo v. United States,* 469 F.2d 650, 651 (5th Cir. 1972).

The master did express understandable concern, however, that the ad hoc method of deciding whether one inmate may assist another in legal matters, and the blanket refusal to allow one jailhouse lawyer to assist any inmate while in the library, might deny access to other inmates. *E.g., Buise v. Hudkins,* 584 F.2d 223, 227 (7th Cir.1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979). Dooley's contentions do not present this problem foursquare, as the ACI was certainly within its rights in refusing to allow Souza to counsel *any* inmate while properly assigned to the performance of other duties, i.e., his work as a porter. In any event, incipient problems in this regard will presumably be resolved by the order that the ACI formulate rules whereby inmates may request to meet in order to discuss legal matters, *see* text *ante* at Part V(B), and by the master's recommendation (to which the defendant has not assigned error) that a formal plan be set in place to establish a mechanism governing inmate requests for in-house legal aid. Given the absence of any objection by the defendant, the court will adopt that recommendation as well.[15]

As to the issues discussed under this rubric, the court will grant limited declaratory relief to the plaintiffs as indicated above; and will order implementing action on the part of the defendant. *See* Part VII, *post.* The Report is, on these points, modified; and, as so modified, it is accepted, sustained and confirmed. So much of the plaintiffs' complaint as seeks money damages for denial of access to the courts is hereby dismissed.

## VI. CENSORSHIP OF PUBLICATIONS.

Dooley alone has raised a claim that the defendant unconstitutionally abridged his right to receive desired publications. The

---

**14.** In *Cepulonis,* the court of appeals rejected a "mixed" plan requiring a library and at least five hours a week of law student assistance when such an arrangement was imposed by the district court as a unilateral and unexplained substitute for the prison administration's own plan. 732 F.2d at 6. The order for law student assistance was coupled with the creation of a "satellite" library and was in addition to the state's provision of an inmate legal clerk at the main law library. *Id.* at 3–4.

**15.** At the confirmation hearing, the defendant proffered a proposed rule designed to achieve this end. *See* Appendix 2. While this proposal is, in its present form, imperfect, it represents a step in the right direction.

facts germane to this assertion are essentially as follows. On February 22, 1984, Dooley sought permission to subscribe to a pair of periodicals written for the New England gay community. "The Gay Community News" is published hebdomally; "Bay Windows" appears half as frequently. Quick was quick to deny the request, stating that "[t]hese papers are of a nature which would be disruptive to the philosophy and rehabilitative goals of the High Security Center." In fact, Dooley was not even informed that a copy of the "Gay Community News", with a letter from its publisher, had been mailed to him and confiscated by prison officials.

The regulations concerning censorship of incoming mail per se, RIDCOM No. 5.17.03, list nine types of correspondence which are subject to censorship. *Id.* at VII. While the master appeared to focus on these provisions, they seem to be largely, if not entirely, inapposite to a consideration of an inmate's right to receive publications.[16] The more pertinent portion of RIDCOM No. 5.17.03 appears to be Article VI, which provides in material part as follows:

A. Incoming mail may be opened and inspected for the purpose of detecting contraband, or when there is reasonable belief that there is a threat to institutional order and security.

\* \* \* \* \* \*

D. Incoming pornographic material will not be accepted.

1. For the purpose of this policy and consonant with security mandates necessary for safe and orderly operation of the institution, pornographic material shall be defined as: any material describing or showing acts of homosexuality, sadism, violent sexual practices and/or unlawful sexual behavior.

These regulations also offer an appeal mechanism by which inmates may contest an adverse censorship finding concerning their mail. *Id.* at IX. Though Dooley never took an appeal, the master noted that the appeal regulations are not incorporated into Mail Rule 5–8 of the High Security Center Manual for the Guidance of Inmates, and that Dooley was probably unaware of his appellate rights. The court endorses this finding. It is clear that an appeal process which is kept squirreled away in the bosom of the lodge is no appeal process at all. And, Dooley brought out at the November 7 confirmation hearing that he had attempted to file a grievance, but that a correctional officer refused to accept it. The defendant did not rebut this assertion.

Dooley has not challenged the validity of any of these regulations on their face;[17]

First, the regulation or practice in question [furthers] an important or substantial governmental interest unrelated to the suppression of expression. Prison officials may not censor inmate correspondence simply to eliminate unflattering or unwelcome opinions or factually inaccurate statements. Rather, they must show that a regulation authorizing mail censorship furthers one or more of the substantial governmental interests of security, order and rehabilitation. Second, the limitation of First Amendment Freedoms must be no greater than is necessary or essential to the protection of the particular governmental interest involved.

416 U.S. at 413, 94 S.Ct. at 1811. A blanket ban on non-explicit materials dealing with homosexuality, for example, would be highly suspect, while pamphlets detailing, say, methods for overpowering guards, could certainly be banned.

---

**16.** The regulations, RIDCOM No. 5.17.03, differentiate between incoming "mail" (a generic term which catches within its sweep all incoming postal matter, including by fair implication newspapers and magazines) and incoming "letters" (a much more restrictive term, limited in the context of the rules to correspondence). Any effort to justify the repressive action vis-a-vis the publications at issue by resort to the restrictions on correspondence is an empty exercise in casuistry.

**17.** Prison censorship regulations must meet the requirements of *Procunier v. Martinez, supra,* wherein the Supreme Court decisively rejected any attempt to justify blanket censorship on the basis of an inmate's legal status. The Court instead held that ordinary First Amendment guarantees must be applied in such cases but must be specially construed in the half-light of the unique characteristics of the penological environment. 416 U.S. at 409–10, 94 S.Ct. at 1809. Thus, prison censorship is justified if:

his objection simply goes to the handling of his particular request. At least on these facts, his grievance is really procedural, in that there was no proper substantive determination made. The record bears out that Quick made a hair-trigger, across-the-board determination without reference to the ACI's established guidelines.[18] He made no review of the periodicals to determine whether or not they transgressed RIDCOM No. 5.17.03(VI). And, the evidence indicates that the journals in question contained merely news of interest to homosexuals as opposed to portrayals of explicit homoerotic behavior.

■ In *Procunier v. Martinez, supra,* the Supreme Court clearly established minimum due process rights in inmate censorship cases. These guarantees insist that "an inmate be notified of the rejection of a letter written or addressed to him, that the author of that letter be given a reasonable opportunity to protest that decision, and that complaints be referred to a prison official other than the person who originally disapproved the correspondence." 416 U.S. at 418–19, 94 S.Ct. at 1814. Lower courts have since held that *Martinez* applies not only to the inmates' personal correspondence, but also to their requests for periodicals and other publications. *Blue v. Hogan,* 553 F.2d 960, 962–63 (5th Cir.1977); *Aikens v. Jenkins,* 534 F.2d 751, 754 (7th Cir.1976); *Morgan v. LaVallee,* 526 F.2d 221, 224–25 (2d Cir.1975). There is no rhyme or reason to apply a less open review mechanism to banned publications than to letters. *See Hopkins v. Collins,* 548 F.2d 503, 504 (4th Cir.1977). In this instance, the failure to notify either Dooley or the publisher of the confiscation clearly violated the Supreme Court's procedural guidelines. As Dooley eventually discover-

ed the seizure when he received a second letter from the publisher which referenced the first mailing, and attempted to grieve it, there was no lasting harm done. To prevent such breaches of duty in the future, however, prison officials must, at the very least, adhere to the minimum standards laid down by the Court.

This court understands that

In assessing the seriousness of a threat to institutional security prison administrators necessarily draw on more than the specific facts surrounding a particular incident; instead, they must consider the character of the inmates confined in the institution, recent and longstanding relations between prisoners and guards, prisoners *inter se,* and the like.

*Hewitt v. Helms,* 459 U.S. 460, 474, 103 S.Ct. 864, 873, 74 L.Ed.2d 675 (1983). Nevertheless, while recognizing both "that prison administrators draw upon an experience peculiar to the institutions they control and to the inmates therein," *Gomes v. Fair,* 738 F.2d 517, 525 (1st Cir.1984), and that such administrators must be accorded considerable latitude "to make judgments concerning questions—including close and difficult questions—within their expertise," *id.,* at 526, it is not too much to ask that a corrections official abide by the institution's own policies or that he make a logical statement of the grounds upon which his actions rest. While it is the court's business "to decide ultimately whether a first amendment violation [has] occurred, the reasoning and judgment of the prison authorities could be useful components of the court's decision in this regard." *Id.* at 528. A guideline, after all, is of scant utility in a penitentiary setting if those charged with its enforcement do not deign to employ it.[19]

18. Indeed, the defendant did not attempt to defend his rejection of the materials on the basis of this regulation at either the May 16 evidentiary hearing or the ensuing hearing on confirmation.

19. The defendant should have familiarized himself with the periodicals and stated which regulations he applied as a standard for such review. If the submission was rejected, he should then

have provided clear and detailed reasons for the decision. It is the prison officials' burden to demonstrate that a publication "poses a tangible threat to the order, security or rehabilitative programs of a prison before they may bar [it]," *Jackson v. Ward,* 458 F.Supp. 546, 559 (W.D.N.Y.1978), and unless they meet that burden, inmates' First Amendment rights will be placed in undue jeopardy. And, if an appeal is taken from an order banning such material, the ulti-

■ As regards Dooley, however, the censorship dispute has now abated. Between the time that the master's Report was filed and the holding of the confirmation hearing, a prison committee comprised of the defendant, a prison psychologist, and the ACI's chaplain reevaluated the situation and granted Dooley permission to receive the controversial publications.

Quick's synopsis of the panel's findings, presented at the November 7 hearing, reads in part:

It was agreed that these particular publications may be considered to be personally offensive to many individuals. However, after applying the standard of what an objective person could reasonably believe to be directly detrimental to security, order, or rehabilitation it was determined that these publications did not, in themselves, present a threat to any of these areas. Neither of these papers contained material which would be considered pornographic.

After thorough review of these publications and in-depth discussion regarding their content, it was agreed that these papers could be allowed at the High Security Center and that they should not interfere with the rehabilitative goals or the security.

Dooley has been apprised of this administrative determination and of his right to subscribe to "Gay Community News" and/or "Bay Windows." With the apparent rectification of the procedural fault, any substantive question concerning this plaintiff's rights have disappeared.

The First Circuit has described the doctrine of mootness in the following manner:

[J]urisdiction, properly acquired, may abate if the case becomes moot because (1) it can be said with assurance that 'there is no reasonable expectation ...' that the alleged violation will recur, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation.

*Loeterman v. Brookline,* 709 F.2d 116, 118 (1st Cir.1983) (quoting *County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979)). *See also Duffy v. Quattrocchi,* 576 F.Supp. 336, 340 (D.R.I.1983). Since there is nothing to suggest that this consent will suddenly or arbitrarily be withdrawn, and inasmuch as the interim relief has wholly eliminated the problem, Dooley's grievance as to the censorship has been mooted. Given the manifest good faith which the state has demonstrated in the proceedings in this court and before the master, there is not a "reasonable expectation that ... [the plaintiff] would be subjected to the same action again." *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam). And Dooley, at the November 7 confirmation hearing, acknowledged that he was fully satisfied in this respect, and acquiesced in the dismissal of this portion of the complaint.[20]

The findings and recommendations of the master on the censorship issues, while admittedly helpful to the parties and to the court, are beside the point, given this turn of events. The Report is, accordingly, rejected as to the matters discussed under this rubric; and so much of the plaintiffs' complaint as pertains to censorship and kindred matters is hereby dismissed for mootness.[21]

## VII. CONCLUSION.

All of the master's findings of fact are confirmed except those pertaining to the censorship issue (now moot). The master's

mate determination must be made by a disinterested party not privy to the initial judgment. *Hardwick v. Ault,* 447 F.Supp. 116, 131 (M.D.Ga. 1978); *Laaman v. Helgemoe,* 437 F.Supp. 269, 322 (D.N.H.1977); *Sostre v. Otis,* 330 F.Supp. 941, 946 (S.D.N.Y.1971).

**20.** Inasmuch as Dooley was the sole progenitor of the censorship claims, *see* text *ante,* Coulter's acquiescence is not a prerequisite to dismissal of this count. In any event, Coulter is no longer in custody, *see* note 1 *ante,* and failed to appear at the November 7 hearing. The court has no reason to believe that he retains any interest in the prosecution of this litigation.

**21.** Dooley has pressed no claim for money damages referable to the short-lived interruption of his right to receive the two periodicals.

recommendations are accepted only to the extent specifically adopted by the court in this opinion. Thus, the master's Report is accepted in part, modified in part, and rejected in part, all as noted herein.

The plaintiffs' claims for discrimination and for suppression of reading materials are denied and dismissed. The plaintiffs' claims of persecution, *see* Part V(A) *ante*, are likewise denied and dismissed.

The plaintiffs' claims for denial of access to the courts, *see* Parts V(B) and V(C), *ante*, are allowed in part. The court declares that the Center must adopt, at the earliest practicable time, written rules governing (i) the rights of prisoners to meet and to confer in respect to joint legal claims, and (ii) the rights of prisoners to seek assistance from inmate writ-writers. The court directs that the defendant, in his representative capacity, formulate such rules, consonant with the needs of the institution, the rights of the inmates, and the teachings of this opinion. The same shall be presented to the court and to the plaintiffs for approval within thirty days from and after the date hereof. The court will retain jurisdiction of this cause for the time being pending the promulgation and ratification of such rules, and for the limited purpose of overseeing the adoption of such rules.[22]

Each and all of the claims of the plaintiffs for money damages and for other or further redress are hereby denied; and the complaint is dismissed in all respects except as to the granting of declaratory and injunctive relief in connection with Parts V(B) and (C) of this opinion as limned hereby. All claims against Quick in his individual capacity are similarly dismissed.

*It is so ordered.*

## APPENDIX 1
### PROPOSED RULES TO ALLOW INMATES TO DISCUSS LAWSUITS

It is recognized that in specific situations there is a need for certain inmates to meet for scheduled periods to discuss law suits. Such meeting will be for active cases and will always be subject to the following conditions:

1. Permission for a meeting will be obtained by submitting a "pink slip" to the Associate Director.
2. Proof a legitimate law suit must be produced by the inmates requesting such a meeting.
3. Both inmates requesting a meeting must be on normal "A" Status and living in the general population.
4. Known enemies will not be approved.
5. Dates, times, and length of meetings will be scheduled by the Associate Director or his designee.
6. All meetings will take place at the High Security Center Library.
7. Discussion of the immediate law suit will be the only purpose of the meeting.

## APPENDIX 2
### PROPOSED PLAN TO ALLOW INMATES TO SEEK ASSISTANCE OF A JAILHOUSE LAWYER

It is recognized that in specific situations there is a need for certain Inmates to meet for scheduled periods to discuss law suits. Such meetings will be for active cases and will always be subject to all security stipulations. All such meetings shall be subject to the following conditions:

1. Permission for a meeting will be obtained by submitting a "pink slip" to the Associate Director.
2. Proof a legitimate law suit must be produced by the inmates requesting such a meeting.
3. Both inmates requesting a meeting must be on normal "A" status and living in the general population.
4. Known enemies will not be approved.
5. Dates, times, and length of meetings will be scheduled by the Associate Director or his designee.

---

**22.** Since the plaintiffs have prevailed, at least in part, on the two issues in question, the court will appoint counsel for the limited purpose of representing the plaintiffs in connection with the framing of the rules contemplated by this order. The reasonable fees of such counsel shall be taxed against the defendant pursuant to 42 U.S.C. § 1988.

6. All meetings will take place at the High Security Center Library.
7. Discussion of the immediate law suit will be the only purpose of the meeting.